ROGERS CALDWELL *v*. THE STATE.

(*Nashville,* December Term, 1931.)

Opinion filed April 30, 1932.

326

328

W. M. Fuqua and Rascoe Bond, for plaintiff in error.

W. F. Barry, Jr., Assistant Attorney-General, for defendant in error.

Mr. Justice Cook delivered the opinion of the Court.

The plaintiff in error, referred to as the defendant, was tried upon an indictment of six counts: (1) For fraudulent breach of trust; (2) grand larceny; (3) accessory before the fact to the fraudulent breach of trust; (4) accessory before the fact to grand larceny; (5) receiving property feloniously obtained by fraudulent breach of trust, and (6) receiving stolen property.

It was stated in the indictment that in March, 1930, Hardeman County issued, sold and delivered to Caldwell & Company, a corporation, bonds of the par value of $200,000 for which it received, including accrued interest and premium, a credit of $202,431.66 on the books

of the company, to be withdrawn by the county as required for the construction of roads. To secure the sum charged to Caldwell & Company, it was agreed by the county officials and by the purchasing agents of Caldwell & Company that the company deposit with the Bank of Tennessee, as trustee, the $200,000 of Hardeman County bonds and $2,000 of State of Tennessee bonds as collateral, the pledged securities to be released by the trustee accordingly as Hardeman County drew upon the deposit with Caldwell & Company. It was also agreed that Caldwell & Company might withdraw the collateral originally pledged upon the substitution of an equivalent of obligations of the United States, the State of Tennessee, or municipalities of Tennessee.

It was charged in the indictment that the defendant, as president of the Bank of Tennessee, having in his hands or under his control the pledged bonds, took them from the custody of the Bank of Tennessee and transferred them to Caldwell & Company in violation of the trust, and converted them to the use of Caldwell & Company.

Upon the evidence presented, the material part of which is hereinafter given, the jury convicted the defendant of fraudulent breach of trust, as charged in the first count. The effect of this was acquittal of the other offenses covered by the last five counts. The appeal is from the judgment upon the verdict of guilty of fraudulent breach of trust.

It is insisted, through assignments of error, (1) that the defendant did not appropriate the Hardeman County bonds and did not know of their appropriation until after the act was done by officers of the corporation, and that there is no evidence to fix criminal responsibility up-

on him as president for the acts of other corporate officers. (2) That the evidence supports the foregoing theory of the defendant, and preponderates against any theory upon which the verdict could rest. (3) That his conviction was the result of public excitement and prejudice aroused by the financial crisis that attended and followed the collapse of Caldwell & Company and by subsequent political activities that attended a legislative investigation that kept his name fresh in the public mind; and that the trial judge erred in refusing to postpone the hearing until this excitement and prejudice subsided. (4) That the impossibility of a fair and impartial trial, which the law assures to all persons accused of crime, in the atmosphere that surrounded the selection of the jury and the trial of the cause was established and emphasized not only by evidence in support of a motion for continuance but by the statements of some of the jurors after the verdict.

When the cause was called for trial June 1, 1931, the defendant moved a continuance and in the alternative a change of venue, because of local public excitement, prejudice and hatred aroused by the failure of Caldwell & Company and its financially injurious effect upon the locality, which, with subsequent political activities, made it impossible for defendant to then have a fair and impartial trial.

This motion was supported by the affidavit of the defendant and affidavits of more than a hundred leading citizens of the vicinity, together with exhibits of speeches by members of the State Legislature made about the time the case was called and by newspaper articles.

The State filed counter affidavits of nearly a hundred leading citizens traversing the affidavits in support of the motion.

■ If the evidence in support of the motion revealed the then existing state of the public mind, the hearing of course should have been postponed. If the evidence in resistance of the motion revealed it, the motion should have been overruled. That was a question of fact for the determination of the trial judge in the exercise of his sound discretion, which means judicial discretion exercised on full and fair consideration of the facts presented to the judge by the well-known and established mode of procedure. *State* v. *Poe,* 8 Lea, 648.

■ The trial judge took the motion under advisement and disposed of it June 3rd. The record shows that, in response to an inquiry of counsel for defendant after the motion was disposed of, the judge stated, "I said that the court had considered the matters presented by counsel for the State and the defendant, and the court in addition had made private investigation and observations for the purpose of determining it." Counsel for the defendant then said: "As I understand Your Honor's ruling is based both on the record which is before you and the private investigation that you have made yourself outside the court. The court replied, "Yes."

The order overruling the motion reads:

"The court has examined and considered the affidavit and supplemental affidavit of the defendant and numerous affidavits of citizens filed and exhibited by defendant, together with other exhibits filed, and has also considered certain letters in support of defendant's affidavit and motion for continuance.

"The court has also considered affidavits presented by the State in support of their resistence of a continuance. In addition to these affidavits presented by the State and the defendant, the court has also made private investiga-

tion and observations, including all affiants, for the purpose of ascertaining whether or not there exists too great excitement to the prejudice of the defendant, or whether or not any great public excitement exists as would prevent or render improbable that defendant could not have a fair and impartial trial at this time.

"From a consideration of all these matters . . . the court is of the opinion that there does not exist too great excitement or prejudice in this county so that the defendant cannot have a fair and impartial trial at this time; therefore a continuance is denied."

The trial judge's resort to private investigation indicates unwillingness to base his decision upon the legal evidence before him. The source and the character of the evidence obtained through his private investigation and its probative value are not shown. The legal evidence in support of the motion offered by the defendant shows very great excitement and public interest protracted by political agitation and its attendant publicity and involving numerous charges against the defendant concerning the use of public funds by the corporations under his control. This was rebutted by the counter affidavits of the State, which was the only other legal evidence that could be considered.

The causes of this agitation and attendant excitement or their justification were immaterial. The inquiry before the trial judge related to their effect upon the public mind—the mass mind, which subconsciously affects individuals, and by that means carries its influence to the jury.

We cannot apply the rule of *Ross* v. *State,* 130 Tenn., 390, wherein the court held that the determination of the trial judge upon the evidence presented was matter for

his sound discretion, because it is impossible to know whether the legal evidence or his private investigation moved him to the conclusion reached. He could not legally act upon private knowledge obtained through private investigation. To so hold, in view of our rule that his exercise of discretion will not be reviewed if supported by the legal evidence, would in effect end the inquiry on review upon a showing that the trial judge considered evidence outside the record. There would be no way to determine whether the legal evidence or the private inquiry constituted the basis for the judge's exercise of discretion mentioned in *Ross* v. *State,* and like cases.

The trial judge erred in accepting and considering evidence privately acquired by him or evidence beyond the record. I Chamberlayne Modern Law on Evidence, 574. While it was error to consider such extraneous evidence privately procured, it is the duty of the court to look to the record and determine from the evidence whether the error thus committed affected the merits of the case for it is long accepted practice in this court, reinforced by statute, chapter 32, Acts of 1911, that there can be no reversal for error unless the error affected the merits of the case or impaired a constitutional right. *Harness* v. *State,* 126 Tenn., 365; *Munson* v. *State,* 141 Tenn., 522.

The record shows that Caldwell & Company and the Bank of Tennessee were corporations and that the crime charged to the defendant grew out of acts done in the corporate name.

It is specifically charged in the count upon which the verdict rests that defendant, as president of the Bank of Tennessee, a corporation, had in his hands and under his control the pledged bonds, and that he fraudulently ap-

propriated them to the use of Caldwell & Company. It was the theory of the State that the bonds were taken from the trust by defendant's instructions or that it was done pursuant to a general plan or scheme of the corporate organizations designed for that purpose.

The objective of the State in the trial court, as indicated by the evidence, was to cut through the corporate entity, pass the other corporate officers who might have actually made the misappropriation, and fix criminal responsibility upon the defendant as head of the corporation for directing the appropriation or knowingly permitting it to be done.

The following sections of Shannon's Code provide:

6580. "The fraudulent appropriation of personal property or money by any one to whom it has been delivered on deposit, pledge, sequestration, or to be carried or repaired, or in whose hands or under whose control it may be by his position as clerk, agent, actor, or bailee, or on any other contract or trust by which he was bound to deliver or return the thing received or its proceeds, is a fraudulent breach of trust.

6581. "So is the fraudulent appropriation of certain specific property by any one to who it has been delivered on a contract of loan for use, or of letting and hiring, after the time at which, according to the contract, the right of use acquired thereby has ceased, or before that time, by a disposition not authorized by the contract.

6582. "Punishment—The punishment for fraudulent breach of trust, as above declared, shall be imprisonment in the penitentiary not exceeding five years, if the property be of the value of fifty dollars or under, and not exceeding ten years if above that value."

It is insisted by the State on appeal that the direct and circumstantial evidence shows that the defendant, by consent and concurrence in the act of appropriation, made himself morally and legally guilty of the fraudulent breach of trust of the Hardeman County bonds.

In *Cooley* v. *State,* 141 Tenn., 33, the court said that "an officer or agent of a corporation cannot shield himself from criminal responsibility for his own act on the ground that it was done in his official capacity, nor assert for defense that criminal acts were not his acts merely because carried out by him through the instrumentality of a corporation which he controlled and dominated in all respects and which he employed for that purpose."

In the annotation of *State* v. *Thomas,* 33 A. L. R., 785, it is said:

"There is no dissent in the decisions which have passed on the question, from the conclusion that an officer or employee of a corporation may be held criminally responsible for the embezzlement or larceny of the property of a third person through a corporate act, where the act was done by the individual officer, at his direction, or by his permission."

In accord are *State* v. *Parker* (Conn.), 151 Atl., 325; *State* v. *Carmean* (Ohio), 102 N. W., 97; *State* v. *Ross* (Oregon), 104 Pac., 596; *Christner* v. *State* (Okla.), 257 Pac., 3301; *State* v. *Standard Oil Co.,* 49 Ohio St., 137.

In *State* v. *Ross,* it was said "an officer of a corporation is not liable for an offense committed by the corporation, except where he has in some way participated in the illegal act as an aider, abetter, or accessory." 3 Thompson on Corporation, section 4114.

. In *State* v. *Carmean*, it was said "the officer cannot be criminally liable for the acts of his subordinates in greater measure than the principal is liable for the acts of his agents or servants, and it is well settled that a principal is not liable for the (criminal) acts of his agents, though done in the general course of the employment, unless they are directly authorized or consented to by him; for the authority to do a criminal act will not be presumed."

The defendant was president of Caldwell & Company and also of the Bank of Tennessee, and owned or controlled the stock of both corporations.

The other officers of Caldwell & Company, were J. D. Carter, E. J. Heitzeberg, Frank Marr and C. H. Alexander, vice-presidents, and C. H. Donovan, secretary.

The officers of the Bank of Tennessee were J. D. Carter, vice-president, E. A. Goodloe, cashier, and E. B. Smith, trust officer. Smith was also trust officer for Caldwell & Company.

There was a system of interchangeable trusts and of deposits between Caldwell & Company, and the Bank of Tennessee. Both were under control of the same individuals, indicating a vice and the opportunity for abuses of trusts, made possible by our statutes regulating corporations.

In support of the indictment the State introduced Smith, Goodloe and Carter, all officers and active participants in the business of the two corporations. Each testified concerning the affairs of Caldwell & Company, and the Bank of Tennessee, before the State legislative investigating committee, which held its sessions until about the time this case was taken up for trial in the criminal court of Davidson County; and all were granted

immunity from prosecution under section 8, chapter 3, Acts of 1931, for criminal acts that might have been committed by them in connection with the business of either corporation.

Carter testified on the trial of this cause that for some years preceding 1930, Caldwell & Company's transaction in bonds and securities amounted to $100,000,000 a year, and the daily cash turnover was from $300,000 to $400,000. The business was conducted through nine departments with 150 employees at the central office and nearly as many more at branch offices, so it is shown by the evidence. Each department was managed by an executive. Vice-President E. J. Heitzeberg managed and directed the purchasing department. The witness Carter managed and controlled the sales department and, according to Goodloe and Smith, as managing vice-president of the corporations, directed their internal affairs and was responsible for the administration of the trust department.

We quote Smith:

"Q. You said J. DeWitt Carter was vice-president of Caldwell & Company? A. Yes.

"Q. And managed the inside business to the best of your knowledge? A. To the best of my knowledge.

"Q. A kind of managing vice-president? A. That is the way we looked on him."

Carter was Goodloe's superior and as managing vice-president exercised authority over the administration of the trust department, and was also in charge of the sale of bonds, according to the testimony of Goodloe.

The Bank of Tennessee, with Goodloe, cashier, and Smith, trust officer, was an adjunct of Caldwell & Company. The purchase of bonds and the execution of con-

tracts regulating their purchase was controlled by E. J. Heitzeberg, executive head of the buying department of Caldwell & Company.

The contract for the Hardeman County bonds was signed by L. L. Clark for Caldwell & Company, and the trust agreement was executed by G. B. Wilson, assistant cashier of the Bank of Tennessee. Under the contracts of March 5, 1930, the Hardeman County bonds passed to the custody of E. B. Smith, trust officer for the Bank of Tennessee.

Smith testified that he was custodian of the securities and records of the trust department and that all securities of the trust department of the Bank of Tennessee were kept in a separate rented vault under his control at the Fourth & First National Bank. The collateral pledged to each trust and the trust agreement were kept in separate files and when his department received an order for particular bonds the trust agreement would be looked to to determine the conditions upon which collateral might be released.

Prior to the appointment of the receivers, Smith had under his control an average of 150 trusts, and because of the activity of the purchasing and selling departments of Caldwell & Company he says it was necessary to make from thirty to forty substitutions a day in order to keep the trusts in conformity with the contracts. We quote Smith:

"Q. When you received an order from another department of Caldwell & Company for particular bonds what steps would you take to deliver the bonds and protect the trust? A. We would make a swap sheet to show what was coming off the trust and what was going up, and fill the order.

"Q. In other words, you filled the order that had been sold by Caldwell & Company on requisition to your department? A. That is true.

"Q. Having taken down the collateral pledged to secure the trust consisting of municipal bonds, what would you do to protect it? A. In most cases I put up municipal bonds.

. . . .

"Q. You were asked by His Honor who would determine what you would take down. That was determined by your department? A. Yes.

. . . .

"Q. When you went to make a substitution, having digested the trust agreement, you proceeded to make your substitution on that basis? A. That is true.

"Q. Now all of that was done in the trust department? A. Yes.

"Q. During the whole period that you worked there you never had a conversation with Rogers Caldwell about any trust or trust agreement? A. That is true."

On March 8, 1930, after the Hardeman County bonds came to Smith's possession as trust officer, he says $184,000 of them were taken down upon requisition from the sales department and $111,000 of municipal bonds substituted. That left the trust impaired but Smith says the record was kept on the desk so they could make up a shortage that might result in particular transactions from the activity of the day and that he or employees under him in the trust department would put up on the trust dollar for dollar of the amount withdrawn.

He must have referred to an antecedent custom in his department, for it was not done in this instance. Smith's records show, and he admits, that on March 8th, addi-

tional Hardeman County bonds were withdrawn and at the end of that day's business the collateral pledged for the Hardeman County trust was $75,000 short of requirements.

On March 10th, the last of the Hardeman County bonds were withdrawn from the trust without adequate substitution for the collateral was $131,000 short that day. March 12th, $55,000 of Carter County bonds were substituted and on March 13th, $78,000 of Carter County Bonds, but this was less than the contract required. There was a series of subsequent withdrawals and substitutions until November. According to Smith and Goodloe, the defendant, some time in late October or early November, acting in concert with other officers of the Bank of Tennessee and of Caldwell & Company, endeavored to protect the trust by putting up Inter-Southern Insurance Company stock, or a repurchase agreement of that company involving sufficient securities and of supposed market value sufficient to protect the Hardeman County deposit which had at that time been reduced by credits.

It was charged in the indictment that defendant appropriated the Hardeman County bonds and the two $1,000 State of Tennessee bonds. The record shows that all of the Hardeman County bonds were taken from the trust by Smith on requisition from the sales department as early as March 10, 1930. On April 9, 1930, the collateral on the Hardeman County trust consisted only of Cadet Hosiery Mills bonds and Alabama Mills stock, so that the two Tennessee bonds must have been taken from the trust prior to April 9th, and the Hardeman County trust altogether breached on that day, for there was no subsequent restoration of the character of securities required by the contract.

The indictment limits the charge to the appropriation of the Hardeman County bonds and the two Tennessee bonds and, as stated, all of these were taken from the trust before April 9th, the greater part, if not all, by March 10, 1930.

Referring now to the specific charge that defendant took down the bonds:

Much of the unnecessarily large record is devoted to occurrences subsequent to the alleged fraudulent appropriation made on or before April 9th. Whatever light such evidence of subsequent acts might have thrown upon the other counts of the indictment, it could have no probative value when applied to the specific charge of a fraudulent appropriation of the Hardeman County bonds and the Tennessee bonds, the trust having been broken on or before April 9th. However, this evidence might have been considered as a circumstance upon the issue of whether or not the specific breach was committed by an agent of the corporation pursuant to a general plan or scheme designed for the criminal purpose of fraudulently appropriating bonds procured under trust agreements.

The verdict resting as it does upon the first count limits the inquiry upon review to whether or not the defendant took, or caused to be taken, the pledged collateral and appropriated it to the use of Caldwell & Company, or whether it was done pursuant to a general scheme or plan of corporate organization designed by defendant and used by him for that criminal purpose.

The defendant testified that the corporations under his control were organized for the legitimate purpose of handling bonds and other securities in the South, and that the method of buying bonds on trust agreement was

a method customary with other bond dealers, and by constituting a trust department in the corporation it was enabled to avoid the expense of a stranger trustee and accordingly enhanced the price paid for the bonds. He testified that he had no knowledge of irregular or illegal practices in the trust department and, on the contrary, that he discountenanced violation of trusts, and when an occasional irregularity in that department was brought to his attention that he caused it to be corrected in conformity with the trust agreement.

The defendant further testified that his time was absorbed by outside affairs, preventing him from giving attention to particular detail, and that the sales department, trust department and the Bank of Tennessee were altogether under the control of Mr. Carter, Mr. Goodloe and Mr. Smith; and that he did not know of the creation of the Hardeman County trust or of its violation until late in the summer and when the fact was brought to his attention he attempted to have it restored.

Smith testified that to his knowledge defendant did not know of the existence of the Hardeman County trust until about the time Caldwell & Company failed.

Goodloe testified that he discussed matters in the trust department with the defendant only twice, fixing the time by reference to reports sent to him, one in 1929, and another in September or October, 1930. On each occasion, according to Goodloe, the defendant thanked him for the information, expressed disapproval of the irregularities reported, and said he would take steps to have them corrected. Goodloe also testified that from June, 1930, down through October he and Carter were at work trying to strengthen the trusts and that all, about twenty-five having been irregular during the year, were

brought into conformity with the trust agreement except the Hardeman County trust and maybe a few others, and that they were unable to correct these because of the financial condition of the company.

Goodloe further testified that he was employed by Carter in 1925, and that he looked to Carter as managing vice-president for directions, not only while he was trust officer but after he became cashier of the Bank of Tennessee. He says that both while he was trust officer and after he became cashier it was part of his daily routine to go over the trust reports with Carter. According to Goodloe, Carter fixed the value of securities other than municipal bonds that were to be attached to trusts, and says that when the value was fixed by Carter he made substitutions accordingly while he was trust officer, and that Smith, his successor, did likewise. We quote Goodloe:

"Q. In connection with giving those values, say we were going to substitute on a certain trust and put up a certain bond, would you previously ascertain the value of that bond or stock? A. Invariably, on all stocks and bonds except municipal bonds. We used our own judgment on municipal bonds.

"Q. Now if temporarily you didn't have municipal bonds to substitute on a particular trust and you were going to put up some other kind of stocks and bonds, would their value be fixed by Mr. Carter? A. Yes, sir.

"Q. Wasn't that the invariable rule? A. Yes, sir.

"Q. And that was the rule in this case, the Hardeman County case? A. Yes, sir.

"Q. And Mr. Caldwell had nothing to do with fixing the value of those stocks and bonds? A. No,

"Q. As a matter of fact, Mr. Goodloe, of your own knowledge, Mr. Caldwell didn't know there was such a trust agreement as this in existence? A. No, sir, I couldn't say that he did."

While Goodloe's letter to Caldwell, Carter and Heitzeberg of March 18, 1930, insisting that they strengthen the cash position of the company and of the bank, refers to things, officially sanctioned, Goodloe testified in explanation:

"Q. I am asking if you ever knew of Mr. Caldwell sanctioning any irregularity at any time in that business? "A. Not a time."

The importance of Carter's position and authority in these corporations is not only shown by testimony of Smith and Goodloe but is indicated by the responsibility of his position and his salary, which exceeded $30,000 a year. He commenced as a bookkeeper with Caldwell & Company at $175 a month and grew up with the organization.

Carter says as early as 1928, the auditors called his attention to irregularities in the trust department and that he then insisted that defendant have them corrected; and that defendant promised to look into the matter but didn't do anything. Carter says he went back to defendant and again asked him to correct irregularities in the trust department and that all he received was more promises. The date of this last interview with defendant about the trusts is not fixed by Mr. Carter.

Goodloe testified that the irregularities found by the auditors in 1928, were corrected and his testimony indicates that few, if any, irregularities occurred in the trust department until early 1930.

The testimony of Carter, or the letters on which he bases his testimony, express more concern about the lack of capital to meet the requirements of the business than of specific violation of trust, for speaking by reference to his letter to defendant he says, ''Maybe for a short time sales would run ahead of purchases and that would ease the situation and then possibly at other times purchases would run ahead of sales. Of course that is what brought on the final failure. More stuff than we could carry. We didn't have capital. My efforts to stop violation of trusts was to get Mr. Caldwell to provide sufficient capital to carry on the business as it was then being conducted, to stop buying things that we were tying money up in and go on record in no unequivocal way with the men that were handling these matters.

''Q. After these conversations with Mr. Caldwell, I will ask if you took any decisive action?

''A. I did take decisive action in the early part of 1930. It was taken after my conversation with Mr. Caldwell about providing adequate capital to carry on the business, and after my repeated efforts to get him to stop the practices that were going on in the trust department.

''Q. What was your action?

''A. A letter of resignation.''

Mr. Carter says he had many conversations with Mr. Goodloe from the time the auditors brought to his attention violations in the trust department until the letter of resignation of March, 1930, was written, trying to impress upon Goodloe the importance of defending his trusts, no matter what sort of instructions were given by somebody to violate them.

Goodloe testified that Carter, as general manager of the sales department and supervisor of the trust department and of the internal affairs of the corporations, directed the withdrawal and substitution of securities on trust. We quote Goodloe:

"A. He didn't like to make irregular substitutions but said that shipments came first. It was a sort of unwritten law that when we had a shipment of bonds they took precedence over anything else. We would lay aside work of any kind and get the bonds out in this way to sell, and generally Mr. Carter would be aware of certain municipal issues that would be due and would say 'You can replace them this afternoon.' Mr. Carter didn't like to do these things any more than the rest of us.

"Q. That was the general attitude of Mr. Carter about these matters?

"A. That was the result of my conversation with him, to go down and get the bonds out. They came first. He would just say 'Go down and get them out and do the best you can and replace them just as soon as you can.'

"Q. You talked with him daily and say that occurred many times with reference to sales?

"A. Yes, sir, always exclusively with reference to sales. We had to draw the bonds down to ship them.

"Q. That is generally the thing that caused this situation?

"A. I thought it had a lot to do with it.

"Q. In other words, if you had a sale of bonds you sold them and would replace them with others when they came in?

"A. Yes, sir.

"Q. Mr. Carter was in charge of the sales department?

"A. Yes, sir."

We now quote Carter:

"About the close of the audit in 1928, Mr. Belzer said some of the trusts weren't handled properly. Some were being violated, and it was a very serious matter. I agreed and called Mr. Goodloe and told him of Mr. Belzer's report, that he was not handling trusts in conformity with agreements."

Previously—some thirty or forty pages back, Mr. Carter referred to conversations with defendant about violation of trusts and stated that defendant promised to correct them but didn't keep the promise. We quote from Carter:

"Q. What was your purpose in carrying these matters to Mr. Caldwell?

"A. Mr. Caldwell was the man in charge of the business. The financing of the business had been handled by Mr. Caldwell or under his direction. I had nothing to do with the financing. The violation of these trusts grew out of the effort to get money to carry on, and these efforts had been under his direction.

"Q. Well is that a conclusion you are drawing, or is it what actually happened?

"A. It is a fact.

"Q. What was that last answer you made with reference to these violations?

"A. Well, these violations grew out of the need of funds to carry the business on, getting the cash was the cause of the violation of trusts, the taking down from the trust bonds and using them to borrow on to raise cash, because we didn't have other bonds we could do that with. And that was the reason I carried the matter to Mr. Caldwell, because he was in final authority of the

business and these violations had been caused, not by my instructions, but certainly at the instructions of some-one.else who was handling the financing of the business.

"Q. Now why did you go to Mr. Goodloe?

"A. Because I wanted to find out from Mr. Goodloe right off the bat whether what Mr. Belzer said was true and because Mr. Goodloe was the trust officer and I felt it was his duty to protect the trusts."

It should be noted here that Smith succeeded Goodloe about two years before the failure of Caldwell & Company.

Referring again to Mr. Carter's testimony, he says Goodloe told him when urged not to violate the trusts, that there was more or less a temporary situation. Mr. Carter also testified that defendant said he felt it was a thing that ought not take place and he would see that it was straightened out.

Goodloe testified that the violation of trusts was due to temporary conditions and done upon instructions from Mr. Carter, who desired to make sale of bonds on trust saying that proper substitutions could be made when certain expected securities came in; and that until such substitution securities other than those called for by the trust agreements would be valued by Mr. Carter and put up temporarily on the trusts.

It is difficult to analyze and give proper probative effect to Mr. Carter's testimony, because so much of it relates to conversations and occurrences after the Hardeman trust was violated in April, 1930, and apparently after Mr. Carter, who was thoroughly conversant with the business situation of Caldwell & Company, realized that failure was impending. Also, because so much of

his testimony is made up of quotations from his letters to defendant of March 17, 1930, May 20, 1930, October 11, 1930, and of Goodloe's monthly trust reports to Carter from the latter part of 1929, until about August, 1930. But the effect of Mr. Carter's testimony is that the organization of Caldwell & Company was such as made it necessary for the sales department to take bonds from the trusts and sell them to procure necessary money for use in financing the business; and that defendant knew and approved of the practices to violate trusts and made no effort to prevent it or to correct existing irregularities and violations.

On the other hand, Mr. Goodloe testified that it was not a general custom and that there was no habitual practice of violating trusts, and that what he calls irregularities in the trust department were caused by Mr. Carter's direction and suggestion that forthcoming securities could be substituted for those taken down, and Goodloe says that proper substitutions were as a rule always made.

Goodloe testified that Caldwell & Company bought bonds for cash and on credit and when on credit the deposit was sometimes secured by collateral pledged in trust and sometimes by a surety bond, and that Caldwell & Company, or the Bank of Tennessee, or the Fourth & First National Bank would be appointed trustee. These trust agreements gave the right to Caldwell & Company to take down the collateral upon substitution of other securities and, as stated, Goodloe says it was their custom to make substitutions dollar for dollar in value.

This method of business, according to Goodloe, was that practiced by other bond houses. Speaking of the trust department over which he had control, Goodloe says

a temporary substitution of other collateral of equal value not within the class authorized would sometimes be made, but that it was replaced by proper collateral as soon as it came in. But he says such temporary substitutions did not often happen.

Goodloe further testified that there were twenty-five trusts not in accord with the contract in 1930, among them the Hardeman trust, but he says must of them were brought in conformity with the trust agreements. However, that was not true of the Hardeman trust.

For eighteen months before the failure of Caldwell & Company, Goodloe says he made monthly reports of the trust department, first to Mr. Carter only, later to Mr. Carter and Mr. Heitzeberg only, and for the last two or three months before the failure of Caldwell & Company he made these reports to Carter, Heitzeberg and the defendant.

It is clear from Goodloe's testimony that defendant was advised of violations of trusts early in 1930, but according to Goodloe defendant disapproved the practice, stated he would see that the irregularities were corrected, and Goodloe says that thereafter he observed that Mr. Carter was more actively interested in bringing the trusts in conformity with the agreements. We quote Goodloe:

"Q. Mr. Goodloe, the condition you have described with reference to the Hardeman trust, had it been the custom of Caldwell & Company and the Bank of Tennessee to carry on its business like you have described?

"A. I never considered we had any such custom but irregularities temporarily of that type were there when Mr. Smith and I came in.

"Q. That was in 1925?

"A. Yes.

"Q. When you went there as trust officer along with Mr. Smith those things were occuring?

"A. Well there was some in existence then.

"Q. Well that is what you said, and has it gone on down the years up to the crash?

"A. No, we got them straightened up on several occasions a hundred per cent."

Goodloe, further speaking of substitutions, said sometimes bonds were due in from branch offices and the trust officer knew they would be there in a day or two and would make temporary substitutions to release bonds for sale and the expected bonds upon coming in would be substituted; and he says when the Hardeman bonds were taken down it was intended as a temporary matter but that trust was never straightened out because the trust department couldn't get municipal or the other bonds required.

There is no evidence that defendant actually, that is physically, took the Hardeman bonds off the trust and appropriated them to the use of Caldwell & Company, or that he knew they were taken until after it was done. His criminal responsibility would depend upon whether or not the Hardeman bonds were fraudulently taken from the trust and appropriated to the use of Caldwell & Company pursuant to a general corporate scheme or plan designed and used by defendant for that purpose through other corporate officers acting under his general directions. If the appropriation was so made through the instrumentality of the corporate organization by defendant's general direction or pursuant to a scheme or plan devised by him with the intent to accomplish the criminal

result, he would be equally guilty with the other employees of the corporation who actually made the misappropriation.

Smith testified that it was a general custom of Caldwell & Company, in common with other bonding companies, to buy bonds under trust agreements with the right of substituting collateral when bonds on trust could be sold, and that the trust department, as a rule, made the substitutions and that there was no general rule or custom of violating trusts; and when bonds were taken down by the trust officer it was with the intention of making immediate substitution of the proper collateral.

We have already quoted the testimony of Mr. Goodloe, which accords with the testimony of Smith, and have also quoted the testimony of Mr. Carter in contradiction. In other words, as we interpret the testimony of Mr. Carter it is to the effect that the business of the corporations was under defendant's direction and the violation of trusts grew out of efforts to get money to carry on the business, and to quote him "these efforts were under defendant's direction."

Thus we have Mr. Carter's evidence from which it might be inferred that the appropriation of the Hardeman bonds was made pursuant to a general corporate scheme or plan designed by defendant, unsupported by the testimony of Smith and Goodloe, State's witnesses, and contradicted by them.

Upon the evidence presented it was the duty of the jury to consider and determine whether or not the defendant himself made the unlawful appropriation of the Hardeman County bonds and the two Tennessee bonds or whether or not the corporations were created and

directed by him for that purpose and to the accomplishment of that end.

In determining these questions the jury had Mr. Carter's testimony and the contradictions of his testimony by Smith and Goodloe and by the defendant. There is much evidence in the record presented in support of the proposition that several jurors, disqualified by prejudice, concealed their disqualification and became members of the jury and there is evidence in the record that after the verdict these jurors stated that their verdict could not have been otherwise in view of the prevailing public sentiment. The evidence of disqualification of these jurors is conflicting, and the trial judge having determined that controversy from the conflicting evidence before him, his decision is not open to review.

Nothing in the testimony of Carter, Goodloe and Smith supplies the reason of the jury's acceptance of Carter's testimony, and their rejection of Goodloe's and Smith's. All were granted immunity from prosecution. All were equally conversant with the facts revealed by their testimony. No attack was made upon their character. This must be considered upon review of the facts made for the purpose of determining whether the error of the trial judge referred to affected the merits, and must be considered in connection with governing rules of appellate procedure.

Procedural and substantive law are so related that rights depending on judicial determination are equally dependent upon legal procedure. Apparently the jury selected from the locality and surrounded by the mental atmosphere shown by the affidavits in support of the motion to continue until the subsidence of excitement, and vividly illustrated by the great bulk of newspaper ex-

hibits, bearing headlines calculated to excite the public mind and create prejudice against the defendant, did not consider the rules of reasonable doubt and the rules for guidance of the jurors in weighing the evidence.

In the trial court it is presumed that a defendant accused of crime is innocent. The result of an issue of guilt in the trial court is made dependent upon proof of guilt beyond a reasonable doubt of the particular crime charged in the indictment. Upon a verdict of guilty, approved by the trial judge, the burden shifts. The presumption of innocence that maintains in the trial court is converted into a presumption of guilt by force of the verdict of guilty. The inquiry is limited upon review to whether or not the evidence upon which the verdict rests preponderates in favor of innocence. That inquiry in the reviewing courts is circumscribed by rules, among them that testimony adopted by the jurors cannot be rejected by the reviewing court. The application of these rules in the appellate court presupposes a fair and impartial procedure in the trial court leading to the verdict, as well as whether or not there was or could be a fair and impartial consideration of the facts in issue by a jury unaffected by outside or extraneous prejudicial influences.

In the application to the trial court for a continuance until the excitement and prejudice against defendant subsided, defendant introduced as exhibits a great number of newspapers carrying statements calculated to arouse public excitement and resentment against him for the alleged use of political influence to bring public deposits to the corporations that he controlled. In addition to these exhibits, he introduced more than one hundred affidavits of leading citizens, among them clergymen, college pro-

fessors, bankers, business men, lawyers, and in fact from all walks of life, who testified that he could not receive a fair and impartial trial at that time because of the great excitement and prejudice that had been aroused against him and kept alive by daily publicity.

The State introduced counter affidavits of leading citizens of the community who expressed the opinion that there was no such excitement or prejudice as to impair defendant's right to a fair and impartial trial at that time.

The affidavits offered by the State do not controvert the essential facts disclosed in the defendant's affidavits and relied upon to establish the existence of prejudice against the defendant. The fact that the name of Rogers Caldwell had been prominent throughout the legislative investigation which continued to the time the trial was begun; that his business activity was the subject of inflammatory addresses on the floor of the legislature; that all this had been the subject of front page newspaper publicity during the weeks and months preceding the trial, were not denied. Nor could these facts be denied in the face of the copies of newspapers of local and general circulation filed with the record as exhibits. The tenor of the State's affidavits is only to express the opinion of the witnesses that a fair trial was probable, a conclusion rendered doubtful by the fact that each of the affiants represented himself as having discussed "matters and things with which the name of Rogers Caldwell was mentioned and connected" for days and weeks, and in some cases months, before the date of the trial. The unanimity with which these affiants admit the general public discussion of the defendant's name and affairs is

somewhat conclusive of the public interest, if not excitement; and in the final analysis the question of the proper conclusion or opinion as to the existence of prejudice to be drawn therefrom was for the court and not for the affiants. There is nothing in any of the affidavits or exhibits to indicate a division of public opinion as to the general culpability of the defendant for the financial disaster resulting to banks and industries in the community from the collapse of his bank and investment house.

The trial judge did not rest his conclusion upon the evidence before him, but states that he went outside of court and outside the record and privately procured evidence which he considered in connection with the legal evidence in adjudging that the evidence introduced by the defendant to support the motion for continuance was untrue.

Persons on trial in courts of justice are entitled to a public hearing upon legal evidence. The rights of no citizen can be determined by evidence procured by a judge through his own secret and private inquiries. Such methods would invade not only the constitutional rights of persons accused of crime or of persons whose property rights were involved, but would be contrary to correct ideals of judicial procedure.

It could not be known upon what evidence the judge reached his conclusion if after hearing the legal evidence he should be permitted to go out and privately procure and consider extraneous evidence in aid of his determination of a controverted fact. We are unable to determine to what extent the jurors were controlled, consciously or unconsciously, by public excitement and prejudice, but it

is clear that the private investigation of the trial judge and his acceptance of the private evidence as the basis of his conclusion was contrary to the spirit of our institutions and the letter of our Constitution.

The minimum or least effect we may give to the error of the trial judge in considering evidence not legally before him, is that such error destroys the presumption of accuracy which would otherwise attach to his ruling, when supported by material evidence. It therefore becomes our duty to consider the question from the record as it should have been considered by the trial judge in the first instance, and render that judgment which, upon the record before us, the trial judge should have rendered. *Smith* v. *Hubbard,* 85 Tenn., 306.

We have heretofore pointed out that the finding of the defendant's personal guilt of the breach of trust required that the jury give credence to the testimony of a single witness for the State, who had it in his power, so long as he held his position as sales manager, to prevent the violation of the trust, and who was contradicted on the essential and vital issue of the defendant's personal knowledge and responsibility, not only by the testimony of the defendant himself but by the testimony of the two other principal witnesses offered by the State. This issue was submitted to a jury drawn from a public whose interest had been aroused by bank failures and by the financial distress of the entire community, fanned and kept alive by continued broadsides from an active and influential press, and by legislative invective and investigation, to the very day the trial was begun. Affirmative testimony that members of the jury were in fact influenced by this public clamor to agree to the conviction

was controverted, but the affirmative testimony is sufficient to reflect somewhat upon the integrity of the verdict.

 It is stated to be the general rule that popular excitement or prejudice is not a sufficient cause for the continuance of a criminal case "in the absence of unusual or extraordinary circumstances." Ruling Case Law, vol. 6, page 553. To this general rule we agree. What would amount to unusual or extraordinary circumstances sufficient to entitle the accused to a continuance is ordinarily a question addressed to the discretion of the trial judge, and for that reason few cases are to be found in which an appellate court has ruled on such a question. In the case before us we are forced by the error of the trial judge to make such a ruling, and in making it cannot avoid the conclusion that the setting of the trial was ill-timed, to the manifest prejudice of the defendant. It is our opinion that the defendant was not afforded the fair and impartial trial which is the right of all persons accused of crime, under the Constitution, Article 1, Section 9. It therefore becomes the duty of this court to reverse the judgment and remand the case to the Criminal Court of Davidson County for a new trial.

All concur.