STATE of Tennessee, Appellee,

v.

Doyle HART, Appellant.

Court of Criminal Appeals of Tennessee, at Jackson.

July 19, 1995.

Permission to Appeal Denied by Supreme Court Oct. 30, 1995.

Charles S. Kelly, Dyersburg, for Appellant.

Charles W. Burson, Attorney General & Reporter, Rebecca L. Gundt, Assistant Attorney General, Nashville, Clayburn Peeples, District Attorney General and Larry Hardister, Assistant District Attorney General, Trenton, for Appellee.

## OPINION

JONES, Judge.

The appellant, Doyle Hart, was convicted of aggravated rape and incest by a jury of his peers. The trial court imposed an effective sentence of fifteen (15) years. This Court affirmed the appellant's sentence and conviction. *State v. Doyle Hart,* Gibson County No. 02–C–01–9209–CC–00202, 1993 WL 305777 (Tenn.Crim.App., Jackson, August 11, 1993). The Supreme Court denied the appellant's application for permission to appeal on November 29, 1993.

On May 21, 1993, the appellant's wife, Lisa Hart, and the appellant's stepdaughter, B.J.,[1] who was the victim in both cases, gave sworn statements to the appellant's attorney, Charles S. Kelly. The essence of the victim's statement was a recantation of her trial testimony. She stated that the appellant had never raped or sexually abused her. Mr. Kelly attempted to raise this revelation in the direct appeal. He filed a motion asking this Court to consider the new information as post-judgment facts pursuant to Rule 14, Tenn.R.App.P. This Court denied the motion.

---

1. It is the policy of this Court to refrain from using the name of a minor who has been the victim of a sex crime.

The appellant filed the present suit for the writ of error coram nobis on November 24, 1993. He alleged in his petition that B.J. had recanted her testimony. He attached the statements of Lisa Hart and B.J. to the petition. He asked the trial court to grant him a new trial based upon this subsequently or newly discovered evidence. The trial court conducted an evidentiary hearing on the merits of the petition. Lisa Hart and B.J. were the only witnesses to testify at the hearing.

When it was discovered that B.J. was being sexually abused by the appellant, B.J.'s natural father was awarded custody. However, her father permitted B.J. to begin living with Lisa Hart in February of 1993. B.J. began talking to Lisa Hart about the appellant's trial approximately two weeks after she moved into the Hart household. B.J. wanted to know what was going to happen to the appellant. Hart testified B.J. expressed the view that the appellant received "too much time" for what he did. When B.J. recanted her testimony, she asked: "[W]ill the Judge just let Bub [the appellant] go and come home?" Lisa Hart denied that she had pressured B.J. to recant her trial testimony.

When B.J. testified at the hearing, she explained that she was "telling a story" when she testified at the appellant's trial. She gave various reasons for recanting. At one point she stated:

I had dreams that somebody was sexually abusing me and it was easier to say— because people around me in my school, they were saying, "hey, I've had sex and all that," and I wanted to be in a group like that, and so, I said, "I was, too," and they asked me, "with who," and I go, "my step-dad."

At another point, she stated:

I just started remembering things. My mom never did tell me nothing. She was always just like quiet. She never told me anything to say or nothing and I knew that I told a lie so I told my mom. I told her that I was lying.

B.J. also testified that she had told others that she "dreamed that this happened."

B.J. was hospitalized for six weeks prior to moving into Lisa Hart's home; and she continued to receive counseling after moving. However, B.J. never gave a plausible explanation for not telling one of her counselors that she committed perjury at the trial. She stated that the counselors would not have believed her. She gave the same response when asked why she did not tell her father or stepmother when she lived in their home. When questioned about the medical proof that corroborated the fact she had been sexually abused, B.J. testified that her stepbrother, age 10, had sexually abused her a "couple of times."

Lisa Hart testified that she had doubted B.J.'s claims that Doyle Hart had sexually abused her before, during and after the trial. According to Hart: "There was not enough facts for me to accept it [B.J.'s allegations]." Moreover, Hart thought that her husband had been "wrongfully convicted." Hart continued to see the appellant after his conviction. It appears that Lisa Hart instituted divorce proceedings after the appellant began serving his sentence in the Department of Correction.

The trial court entered written findings of fact and conclusions of law when denying the relief sought. The trial court stated in part:

4. That at the time of the trial of this cause the minor was in the custody of her natural father. It should be noted that the victim's natural mother, Lisa Hart, has never supported the allegations of the young victim, and she has consistently sided with the defendant throughout this ordeal. For some reason unfathomable to this court the victim's father returned the victim to Lisa Hart. Within a very few days, Lisa Hart, had the young victim in the office of the defendant's attorney to give a statement recanting her testimony at trial. This court is of the opinion that such recantation was given solely due to pressure from Lisa Hart.

5. That after this hearing this court placed the young victim at Timber Springs which is a mental health facility for children, finding such a course to be in the best interest of the minor victim. In a very short time, the pressure from Lisa

Hart being gone, the young victim once again reasserted the facts that she testified to at trial. This court is of the opinion that the child testified truthfully at trial and that the defendant was properly convicted. It should be noted that prior to trial, upon joint motion of the defendant and the State, the trial of this cause was suspended for the purpose of the defendant submitting to a polygraph examination conducted by the T.B.I. concerning these charges. Although not admitted at trial, the results of the polygraph were not in favor of the defendant.

The appellant presents two issues for review. He contends that:

I. The trial Court erred and abused [its] discretion in dismissing Appellant's Petition for Writ of Error Coram Nobis and in denying him a new trial.

II. The trial Court erred in basing [its] decision on alleged information which was never presented at any hearing on Appellant's Petition for Writ of Error Coram Nobis, has never been seen or reviewed by the Appellant or his counsel at any time, is not in the record, and was obviously obtained by the trial Court by private inquiry.

The judgment of the trial court is reversed and this case is remanded to the trial court for a new evidentiary hearing consistent with this opinion.

## I.

### A.

Prior to 1955, the remedy of error coram nobis was not available to individuals who had been convicted of a criminal offense. *See, e.g., Green v. State,* 187 Tenn. 545, 548, 216 S.W.2d 305, 306 (1948). The remedy was limited in scope to civil proceedings. In 1955, the Tennessee General Assembly extended this remedy to criminal prosecutions. Tenn.Code Ann. § 40–26–105. However, the remedy is limited to "errors dehors the record and to matters that were not or could not have been litigated on the trial of a case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, ... in a habeas corpus proceeding," in a post conviction proceeding, *Rowe v. State,* 498 S.W.2d 322, 325 (Tenn.1973), or "for subsequently or newly discovered evidence relating to matters which were litigated at the trial" when the trial court "determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn.Code Ann. § 40–26–105; *Cole v. State,* 589 S.W.2d 941 (Tenn.Crim.App.1979). The purpose of this remedy "is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State,* 219 Tenn. 80, 85–86, 407 S.W.2d 165, 167 (1966).

The procedure in error coram nobis suits is governed by the rules applicable to civil cases to the extent the civil rules do not conflict with the provision of Tenn.Code Ann. § 40–26–105. *See State ex rel. Carlson,* 219 Tenn. at 85, 407 S.W.2d at 167; *Johnson v. Russell,* 218 Tenn. 443, 447–448, 404 S.W.2d 471, 473 (1966). The procedure is almost identical in nature to a motion for a new trial predicated upon newly discovered evidence. *Teague v. State,* 772 S.W.2d 915, 920 (Tenn. Crim.App.1988), *cert. denied,* 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989). As a practical matter, the only difference is the time in which the issue must be raised.[2]

### B.

A petition for the writ of error coram nobis in a criminal case, which seeks relief on the ground of subsequently or newly discovered evidence, should recite: (a) the grounds and the nature of the newly discovered evidence, *Crawford v. Williams,* 31 Tenn. 341, 342 (1851), (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had

---

**2.** When the issue is raised in a motion for a new trial, the motion must be filed "within thirty days of the date the order of sentence is entered." Tenn.R.Crim.P. 33(b). This rule provides that the trial court "shall upon motion allow amendments liberally until the day of the hearing of the motion for a new trial." Tenn.R.Crim.P. 33(b); *State v. Butler,* 626 S.W.2d 6, 12 (Tenn.1981). On the other hand, this issue may be raised in a writ of error coram nobis proceeding "within one (1) year after the judgment becomes final." Tenn.Code Ann. § 27–7–103.

been admitted at the previous trial, Tenn. Code Ann. § 40–26–105, (c) the petitioner "was without fault in failing to present" the newly discovered evidence at the appropriate time, *see State ex rel. Carlson*, 219 Tenn. at 87, 407 S.W.2d at 168, *Johnson*, 218 Tenn. at 448, 404 S.W.2d at 473, and (d) the relief sought by the petitioner. Tenn.R.Crim.P. 47. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. *See Ross v. State*, 130 Tenn. 387, 390–394, 170 S.W. 1026, 1027–28 (1914); *State v. Todd*, 631 S.W.2d 464, 466–467 (Tenn.Crim.App.1981), *per. app. denied* (Tenn.1982).

■ An affidavit, like the testimony of a witness, must be relevant, material and germane to the grounds raised in the petition; and the affiant must have personal knowledge of the statements contained in the affidavit. *See State v. Byerley*, 658 S.W.2d 134, 141 (Tenn.Crim.App.), *per. app. denied* (Tenn.1983). Affidavits which fail to meet these criteria will not justify the granting of an evidentiary hearing since the information contained in the affidavits, taken as true, would not entitle the petitioner to relief. *See, e.g., Todd*, 631 S.W.2d at 466–467. However, if the affidavits are sufficient, and justify an evidentiary hearing, the trial court should not determine the merits of the petition on the strength of the affidavits alone. *Hicks v. State*, 571 S.W.2d 849, 852 (Tenn. Crim.App.), *cert. denied* (Tenn.1978).[3]

### C.

The decision to grant or deny a petition for the writ of error coram nobis on the ground of subsequently or newly discovered evidence rests within the sound discretion of the trial court. Tenn.Code Ann. § 40–26–105; *Teague*, 772 S.W.2d at 921; *Jones v. State*, 519 S.W.2d 398, 400 (Tenn.Crim.App.1974). Before the petitioner is entitled to relief, it must be established, and the trial court must find, that the subsequently or newly discovered evidence "may have resulted in a different judgment had it been presented at the trial."

Tenn.Code Ann. § 40–26–105. This rule presupposes that the evidence (a) would be admissible pursuant to the applicable rules of evidence, and (b) is material to the issues or grounds raised in the petition.

■ As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record, *see Scruggs v. State*, 218 Tenn. 477, 479–80, 404 S.W.2d 485, 486 (1966), or serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial, *see Hawkins v. State*, 220 Tenn. 383, 392, 417 S.W.2d 774, 778 (1967), will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced, would not have resulted in a different judgment.

In exercising its discretion, the trial court must determine the credibility of the witnesses who testify in support of the accused's error coram nobis application. If the trial court does not believe that the witnesses presented by the accused are credible, the court should deny the application. Conversely, if the witnesses are credible, and the evidence presented would result in a different judgment, the trial court should grant the relief sought.

In this case, the trial court obviously did not believe either Lisa Hart or B.J. Ordinarily, this Court would affirm the judgment based upon the trial court's determination that the witnesses were not credible. However, this Court must examine the trial court's consideration of facts that are not in the record before determining whether the judgment of the trial court should be affirmed or this cause remanded to the trial court for a new evidentiary hearing.

### II.

### A.

The written findings of fact prepared by the trial court reveal that the court considered evidence outside the record in determining the merits of the appellant's petition for

---

**3.** In *Hicks v. State,* this Court, addressing an issue of newly discovered evidence raised in a motion for a new trial, said that "[t]o grant relief on affidavits only would deny the opposing party an opportunity to test the accuracy or veracity of the information contained therein by confrontation or by evidence contrary to this assertion." 571 S.W.2d at 852.

the writ of error coram nobis. The trial court considered (a) statements made by B.J. after being placed in a mental health facility for children and (b) the results of a polygraph examination performed upon the appellant which "were not in favor of the [appellant]."

■ It is a well-established principle of law that a "judge is not permitted to make an investigation of a case, even an inadvertent one, off the record, and then base a holding on the information obtained...." *Vaughn v. Shelby Williams of Tennessee, Inc.*, 813 S.W.2d 132, 133 (Tenn.1991); *see State v. Suttles*, 767 S.W.2d 403, 407 (Tenn.1989); *Caldwell v. State*, 164 Tenn. 325, 356–57, 48 S.W.2d 1087, 1097 (1932). Such a practice is contrary to the "correct ideals of judicial procedure," *Caldwell*, 164 Tenn. at 356, 48 S.W.2d at 1097, it violates Canon 3C(1)(a) of the Code of Judicial Conduct, Tenn.S.Ct.R. 10, it violates the rules of evidence, Tenn. R.Evid. 605; *Vaughn*, 813 S.W.2d at 134, and it presents insurmountable problems regarding appellate review. *Vaughn*, 813 S.W.2d at 134.

■ In *Caldwell v. State*, the appellant moved for a continuance "until the excitement and prejudice against [the] defendant subsided." Several newspaper clippings, which contained "statements calculated to arouse public excitement and resentment against [the appellant]," were introduced into evidence. In addition, the appellant introduced one hundred affidavits of the leading citizens of the community to the effect that the appellant could not receive a fair and impartial trial at that time. The state introduced counter affidavits. In denying the motion for a continuance, the trial court stated that it "went ... outside the record and privately procured evidence which [it] considered in connection with the legal evidence in adjudging that the evidence introduced by the [appellant] to support the motion for continuance was untrue." 164 Tenn. at 356, 48 S.W.2d at 1097. In reversing the appellant's conviction for fraudulent breach of trust and remanding the case to the trial court for a new trial, the Supreme Court said:

Persons on trial in courts of justice are entitled to a public hearing upon legal evidence. The rights of no citizen can be determined by evidence procured by a judge through his own secret and private inquiries. Such methods would invade not only the constitutional rights of persons accused of crime or of persons whose property rights were involved, but would be contrary to correct ideals of judicial procedure.

It could not be known upon what evidence the judge reached his conclusions, if, after hearing the legal evidence, he should be permitted to go out and privately procure and consider extraneous evidence in aid of his determination of a controverted fact. We are unable to determine to what extent the jurors were controlled, consciously or unconsciously, by public excitement and prejudice, but it is clear that the private investigation of the trial judge and his acceptance of the private evidence as the basis of his conclusion was contrary to the spirit of our institutions and the letter of our Constitution.

164 Tenn. at 356–57, 48 S.W.2d at 1097.

In *State v. Suttles*, the trial court determined that the minor victim was competent to testify. However, when the state called the victim to the witness stand, the victim "appeared to be extremely uncooperative and unwilling to testify." 767 S.W.2d at 405. The trial court declared a recess and held a hearing in chambers. All of the interested parties and counsel were present. In addition, the victim and his mother were present. Later, the trial court excluded everyone except the victim and his mother. A discussion between the victim, the mother, and the trial court followed. When the chambers conference concluded, the trial court made certain statements to defense counsel as to why the victim did not want to testify. The trial court also made statements that reflected upon the credibility of the victim in the presence of the jury. In reversing the appellant's conviction and remanding the case to the trial court for a new trial, the Supreme Court said:

It is hardly necessary to elaborate upon the action of the judge in this or any other

criminal case in talking privately with a crucial witness out of the presence of the defendant. If nothing else appeared on this record, we would be constrained to reverse this case. We realize that child abuse cases are sensitive and difficult, but they are criminal trials and must be conducted accordingly. A judge is not permitted to make a private inquiry off the record and act upon the information so obtained.... Even in determining the competency of a child to be a witness, the judge should not examine the child outside the presence of the defendant in a criminal case unless the defendant agrees and waives the right to be present....

767 S.W.2d at 407. (Citations omitted).

In *Vaughn v. Shelby Williams of Tennessee, Inc.*, a workers' compensation case, the trial court saw the workman on three separate occasions outside of the courtroom. The trial court stated in its findings of fact: "As to this particular defendant, the court had an opportunity to observe him on one occasion about a week before the trial, on another occasion at the Morristown Mall, and at another time in the parking lot, and, of course, during the trial." 813 S.W.2d at 133. The trial court based its award of benefits, at least "in part," upon these personal observations of the workman. In reversing and remanding this case to the trial court for a new trial, the Supreme Court said:

> There is ample authority for the proposition that a judge is not to use from the bench, under the guise of judicial knowledge, that which he knows only as an individual observer outside of the judicial proceedings. 9 Wigmore, *Evidence* § 2569 at 723 (1981). Judicial knowledge upon which a decision may be based is not the personal knowledge of the judge, but the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role. *State v. Henderson*, 221 Tenn. 24, 424 S.W.2d 186, 188 (1968). No judge is at liberty to take into account personal knowledge which he possesses when deciding upon an issue submitted by the parties. *Laurance v. Laurance*, 198 Or. 630, 258 P.2d 784, 787 (1953). In other words, "[i]t

matters not what is known to the judge personally if it is not known to him in his official capacity." *Galbreath v. Nolan*, 58 Tenn.App. 260, 429 S.W.2d 447, 450 (1967). Significantly, a judge is not permitted to make an investigation of a case, even an inadvertent one, off of the record, and then base a holding on the information obtained incident thereto.... Moreover, when a judge becomes a source of evidence, appellate courts are put in an awkward position in that the character of the evidence obtained through private inquiry or observation, as well as its probative value, is not shown in the record, making an evaluation of the information on appeal difficult, if not impossible.

813 S.W.2d at 133–134.

When a trial court relies upon evidence outside of the record in resolving a factual issue, the court becomes a witness. *Vaughn*, 813 S.W.2d at 134. Rule 605, Tenn.R.Evid., states: "The judge or chancellor presiding at the trial may not testify in that trial. No objection need be made in order to preserve the point."

The trial court should not have considered what it was told about B.J. reasserting what she said at the trial during her confinement in the children's mental health facility. As the court said in *Moore v. Russell*, 294 F.Supp. 615, 620–621 (E.D.Tenn.1968): "Whatever may have been the personal observations and individual views of the judge as a person, these factors have no place whatever in his exercise of judicial discretion." (citations omitted).

### B.

The trial court should not have considered the results of the polygraph examination given to the appellant by the Tennessee Bureau of Investigation. It is a well-established rule of law that the results of a polygraph examination are not admissible as evidence. *State v. Irick*, 762 S.W.2d 121, 127 (Tenn.1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825 (1989); *Grant v. State*, 213 Tenn. 440, 443, 374 S.W.2d 391, 392 (1964); *Marable v. State*, 203 Tenn. 440, 456, 313 S.W.2d 451, 458 (1958); *State v. Adkins*, 710 S.W.2d 525, 529 (Tenn.Crim.

App.1985), *per. app. denied,* (Tenn.1986); *State v. Elliott,* 703 S.W.2d 171, 177–178 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1985); *State v. Delk,* 692 S.W.2d 431, 439 (Tenn.Crim.App.1985); *State v. Land,* 681 S.W.2d 589, 592 (Tenn.Crim.App.1984); *State v. Atkins,* 681 S.W.2d 571, 578 (Tenn.Crim. App.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); *State v. Hailey,* 658 S.W.2d 547, 551 (Tenn.Crim. App.), *per. app. denied* (Tenn.1983); *State v. Plummer,* 658 S.W.2d 141, 143 (Tenn.Crim. App.), *per. app. denied* (1983); *Nolan v. State,* 568 S.W.2d 837, 840 (Tenn.Crim.App.), *cert. denied* (Tenn.1978); *Hembree v. State,* 546 S.W.2d 235, 240 (Tenn.Crim.App.1976). The appellate courts of this state have consistently held that the results of such tests are not reliable. *Adkins,* 710 S.W.2d at 529.

The fact that an accused either offered to take, took, or refused to take a polygraph examination cannot be admitted into evidence. *Grant,* 213 Tenn. at 442–443, 374 S.W.2d at 392; *Marable,* 203 Tenn. at 456, 313 S.W.2d at 458–459; *Adkins,* 710 S.W.2d at 528–29. If a witness has taken a polygraph examination, the circumstances surrounding the taking of the examination are not admissible as evidence. *Land,* 681 S.W.2d at 592; *Delk,* 692 S.W.2d at 439. The examination of the accused pursuant to a state directive does not make this evidence admissible. *Plummer,* 658 S.W.2d at 143.

## CONCLUSION

While it is obvious that the trial court did not believe either B.J. or Lisa Hart, this Court cannot determine what, if any, influence the statements made by B.J. at the mental health facility or the results of the polygraph examination had upon the trial court when determining the credibility of the witnesses. Moreover, the appellant did not have the opportunity to confront and cross-examine the information possessed by the trial court. Therefore, this Court is compelled to reverse the judgment of the trial court and remand this cause for a new hearing on the grounds alleged in the appellant's petition for the writ of error coram nobis.

WADE, J., and JOHN K. BYERS, Senior Judge, concur.