IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2005 Session

## CALVIN O. TANKESLY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-C-1239     Seth Norman, Judge**

---

**No. M2004-01440-CCA-R3-CO - Filed August 19. 2005**

---

The petitioner, Calvin O. Tankesly, appeals the denial of his petition for writ of error coram nobis, arguing that the trial court should have granted him relief on the basis of newly discovered evidence allegedly showing that extraneous prejudicial information was imparted to the jury at his trial. Following our review, we affirm the order of the trial court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Charles E. Walker, Nashville, Tennessee, for the appellant, Calvin O. Tankesly.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In December 1997, the petitioner was convicted by a Davidson County Criminal Court jury of one count of rape of a child and one count of attempted rape of a child, for which he received consecutive sentences of life without parole. See State v. Calvin Otis Tanksley,[1] No. M1998-00683-CCA-R3-CD, 2000 WL 1521475, at *1 (Tenn. Crim. App. Oct. 4, 2000), perm. to appeal denied (Tenn. May 21, 2001). The petitioner's convictions stemmed from his assault upon a six-year-old

---

[1]We recognize that the petitioner's name appears as "Tanksley" in the direct appeal opinion. In this opinion, however, we have used the spelling that appears on the petition for writ of error coram nobis.

girl, B.B.,[2] in the laundry room of an apartment complex. Id. The direct appeal opinion reveals that the State provided overwhelming evidence in support of the convictions:

> In the present case, both Kimberly and her husband, Jimmy [residents of the apartment complex], identified the [petitioner] from a pretrial photographic array, and again at trial, as the same person who was exiting the laundry room after B.B. was sexually assaulted. No other person was observed in the laundry room or in the immediate vicinity of the victim. The victim's aunt testified that B.B. returned to her apartment "hysterical" and had urinated on herself. Such testimony corroborates both the victim's testimony and the testimony of Kimberly and Jimmy. B.B. immediately told her aunt that "that man had tried to kill her" and subsequently explained that he had touched her private parts.
>
> Additionally, the description of the rapist's car matched the vehicle driven by the [petitioner]. Both Kimberly and Jimmy testified that a young blond-headed boy was in the rapist's car when they arrived at the laundry room. At the time of the incident, the [petitioner] had a child of like description and age. Although the [petitioner] had somewhat changed his appearance at the time of trial, the physical appearance of the [petitioner] also matched the descriptions given by B.B. and the other witnesses as that of the rapist.

Id. at *3.

On April 1, 2002, the petitioner filed a *pro se* petition for writ of error coram nobis on the basis of newly discovered evidence of juror misconduct during his trial. Following the appointment of counsel, he filed an amended petition on December 9, 2002, in which he alleged that in January 2000, a cell mate, Curtis Inman,[3] informed him that "Tami [sic] Jones," an employee of the Davidson County Sheriff's Department who served as a juror in the petitioner's rape trial, told Inman that she had learned during the course of the trial that the petitioner was incarcerated for a similar offense and that she had relayed that information to her fellow jurors. The petitioner further alleged that Jones had made similar statements to a Nashville attorney, C. LeAnn Smith. Finally, the petitioner alleged that he had conveyed the pertinent information to his trial counsel and "repeatedly contacted" him in pursuit of the claim, but trial counsel had suspended all communication with him.

The petitioner attached three exhibits in support of his petition: a January 7, 2000, affidavit from Curtis Inman stating that while he was incarcerated at the Davidson County Jail during the first week of September 1998, a correctional officer, Ms. Jones, struck up a conversation during which she divulged that she "worked at the wom[e]n's prison and was able to access [the petitioner's] past

---

[2] It is the policy of this court to refer to minor victims of sexual assault by their initials only.

[3] We note that this individual's last name appears in the record as both "Inman" and "Inmon." For simplicity's sake, we have chosen to refer to him as "Inman," the spelling that appears on his affidavit.

history of incarceration and previous charges on their computer . . . while she sat as a juror in his trial"; a letter from the petitioner to his trial counsel dated April 3, 2000, stating "[a]s you will note from the enclosure [presumably referring to Inman's affidavit], the juror that we suspected would be a problem during our trial, did indeed access my prison file during our trial"; and a November 24, 2002, affidavit from Nashville attorney C. LeAnn Smith stating that a few days after a recent jury trial, she encountered a woman in the snack bar of the Criminal Justice Center who informed her that she had recently sat as a juror on a child rape case and then went on to provide details of the crime that matched the facts in the petitioner's case. Smith stated that the woman "proudly" told her that she worked at the sheriff's department, had pulled the petitioner's criminal record and discovered he had been charged but not convicted of a similar crime, and had shared that information with her fellow jurors.

Nine of the twelve jurors who served at the petitioner's trial ultimately testified at the evidentiary hearing on the petition, which was held on December 16, 2003, and February 13, 2004. Six of those nine, Earl Larson, Vicky Kelly, James Simpson, Rosemarie Williford, Betty G. Stamps, and William Whitesell, testified at the December 16 hearing that no one transmitted any information to them about the petitioner's prior record or incarceration prior to their rendering of the verdicts in the case. Simpson testified that the jurors learned about the petitioner's prior record and incarceration "after it was over with," and Kelly and Williford testified that the district attorney informed them of the petitioner's criminal record at the completion of the trial.

James Gillespie, who said he was the foreman of the jury, testified at the December 16 hearing that he and his fellow jurors were "standing, talking" "as [they] were finishing [their] deliberations" when one of the jurors said, "I don't know anything about him; but, I do know he's in jail." In response to questions by the trial court, Gillespie clarified that the statement was made after the jurors had already completed their deliberations and were "talking in small groups" as they were waiting to be called downstairs to deliver the verdicts. He described the context in which the statement occurred:

> And, there was a . . . lady to the right of me, and I don't know her name. I do know that she worked . . . at the jail or -- or a prison of some sort. And, she just made that statement. There may have been one or two people who heard that. I don't believe that it was a general statement for the -- it wasn't something that was said across the whole table. It was something that was said just in passing at the end of the table.

Gillespie unequivocally testified that the jury neither resumed its deliberations nor changed its verdict in any fashion as a result of the information. He said he "really didn't even think twice about it [the statement] at that time," and had assumed the petitioner was in jail because of the serious nature of the crimes with which he had been charged.

Tammy Jones testified at the December 16 hearing that she believed the petitioner was in prison at the time of his trial because she worked at the sheriff's department and recognized the

transportation officers outside the door. She did not, however, remember sharing that information with anyone on the jury. Moreover, she testified that she doubted she would have done so because she "knew that it would cause complications within the jury." Jones denied she ever accessed the petitioner's criminal record and said that she would not have talked about the case to prisoner Inman. She said she did not know LeAnn Smith and did not remember making any statements to anyone to the effect that she had told her fellow jurors about the petitioner's incarceration.

At the February 14, 2004, hearing, Jones, who had requested the opportunity to explain her previous testimony, testified that although she did not know Ms. Smith by name when asked about her at the previous hearing, she had since read a newspaper article, recognized her as a woman she had seen "a couple of times in passing around the jail and in court situations," and now remembered having talked to her about the petitioner's case. She said she did not, however, remember saying "anything . . . like . . . [she] was accused of saying, like taking records back to the jury," or what she could have said that would have led Ms. Smith "to get something like that out of the conversation." Jones testified that she did not return to work the entire time she served on the jury. She further testified that she was merely an "officer on the floor" at the time of the petitioner's trial and therefore did not have access to the "NCIC system" where the petitioner's criminal history would have been stored. Jones stated she still did not have access to the NCIC system, although she had since been promoted to "disciplinary hearing officer." She said she did not learn of the petitioner's criminal record until she read about it in the newspaper.

Juror Terry Branam testified that no one ever said anything to him about the petitioner's prior record or incarceration. He said he had not known that the petitioner was incarcerated at the time of trial. The petitioner then waived the testimony of the remaining three jurors who had served at his trial.

Christy LeAnn Smith testified that she had just concluded a trial in Division III when she and Ms. Jones, whose name she did not know at the time, struck up a conversation about how Ms. Jones had just been released from the jury pool of that case. Smith said that during the conversation, Ms. Jones stated that she had previously sat on the jury in a child rape case involving a little girl raped in the laundry room of an apartment complex. Smith testified that as the conversation continued, Ms. Jones:

> proceeded on to tell me that she had, and I don't recall exactly the way the conversation went, but she did tell me that she found out that he had been accused of similar crimes in the past, and that she had shared that with the jury. And that there was no way she was going to let him get away with it again, as I recall being her words.

Smith testified that upon her return to her office, she contacted two attorneys at the public defender's office, relayed what she had learned, and asked if they recognized the facts of the case. She said that the following day, Jeffrey DeVasher, who worked in the appellate division of the public defender's office, telephoned to tell her the direct appeal opinion in the case had just been released.

-4-

DeVasher provided her with the name of the attorney who had represented the petitioner on direct appeal and Smith then contacted that attorney.

Smith identified her typewritten affidavit and testified that the information in it was correct. She said she had handwritten an affidavit immediately following her conversation with Ms. Jones but had been unable to find it later. The typewritten affidavit, therefore, "was done some time after the conversation." She stated that the conversation had taken place approximately a year and a half to two years prior to the hearing, or at about the time that the direct appeal opinion in the petitioner's case was released.

Curtis Inman, Jr., testified that in September 1998 he was at the Justice Center awaiting trial when one of the officers who was working at that time, whom he identified as Ms. Jones, told him that she had accessed the petitioner's prior record while serving on his jury and that was one of the reasons he had been convicted. Inman identified his January 7, 2000, affidavit, and testified that it was prepared soon after he relayed the information contained in it to the petitioner. He said he was awaiting trial on two counts of murder at the time, had since been convicted, and was currently serving a life-plus-thirty-five-year sentence.

On May 17, 2004, the trial court entered an order denying the petition on the basis that the petitioner had failed to show a reasonable probability that the alleged juror misconduct, even if true, would have resulted in a different judgment. Among other things, the trial court noted that seven of the jurors testified they had heard nothing about the petitioner's record or incarceration prior to rendering their verdicts; the jury foreman testified Ms. Jones said only that she knew the petitioner was in jail, in a conversation that occurred after deliberations were completed and which could not have been overheard by more than two or three people; and Ms. Jones testified that she did not and could not have accessed the petitioner's record during his trial, as she did not have access to NCIC records. Noting, further, the "substantial and damning" evidence against the petitioner, the trial court concluded that even if Ms. Jones had accessed the petitioner's record during his trial, it was "highly doubtful" that she would have been the one juror who would have resulted in a hung jury.

The trial court's order states in pertinent part:

According to testimony from the hearing in this matter, the only person who claims to have heard any mention of the petitioner's incarceration by Ms. Jones was Mr. Gillespie, and that did not occur until after the jury had completed its deliberations and determined that the petitioner was guilty of the offenses with which he was charged. Obviously, the other jurors had agreed that the petitioner was guilty of the offenses before Ms. Jones, allegedly, spoke of the petitioner's record, so they were not influenced by any extraneous information. If Ms. Jones did, in fact, access the petitioner's record, it should not be presumed that her opinion as to the petitioner's guilt was predetermined. Regardless of whether she knew of the petitioner's record, it is highly doubtful that Ms. Jones would have proven to be the one juror to prevent the jury from reaching a verdict and resulting in a hung jury. Since the evidence

against the petitioner was quite substantial and damning, it does not appear as though a reasonable probability exists that the allegations, if taken as true, would have resulted in a different outcome.

## ANALYSIS

The petitioner contends that the trial court abused its discretion in denying the petition, arguing, *inter alia*, that, regardless of whether she shared the information with her fellow jurors, Jones's knowledge of his prior record and incarceration was enough alone to deprive him of a fair and impartial trial. The petitioner further contends that, in light of the life sentences he is serving and the fact that he did not learn of the alleged tainted jury until his case was in this court on direct appeal, due process requires that the one-year statute of limitations for bringing a petition for writ of error coram nobis be tolled in his case. The State argues that the petition was untimely and should therefore have been barred by the statute of limitations, a petition for writ of error coram nobis is not the proper avenue for raising a claim of juror misconduct, the evidence presented at the coram nobis hearing did not support the petitioner's allegations, and the trial court properly found that the petitioner was unable to show that the alleged newly discovered evidence would have altered the jury's verdict had it been known at trial.

A writ of error coram nobis is an extraordinary remedy by which the trial court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). The remedy is available by statute to a criminal defendant in Tennessee. See Tenn. Code Ann. § 40-26-105 (2003). This statute provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Id. The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See id.; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

The State first raises the one-year statute of limitations as a defense, arguing that the petition is time-barred because it was filed well outside the time for bringing a petition for writ of error coram nobis. The State further argues that the petitioner is not entitled to have the time period tolled because he failed to exercise due diligence by waiting more than two years after first learning of the alleged juror misconduct before filing the petition. We agree that the petition was untimely and that due process does not require that the statute of limitations be tolled under the circumstances in this

case.  See Tenn. Code Ann. §§ 40-26-105, 27-7-103; Mixon, 983 S.W.2d at 667 (stating that the statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court).  However, the statute of limitations for bringing a petition for writ of error coram nobis is an affirmative defense, which the State bears the burden of raising.  See Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003) (citing Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995)).  Since there is nothing in the record to indicate that the State ever raised the statute of limitations in the trial court, the State is precluded from raising it as a defense in this court.

The State next cites Freshwater v. State, 160 S.W.3d 548 (Tenn. Crim. App. 2004), perm. to appeal denied (Tenn. 2005), to argue that the petitioner's allegations of juror misconduct should have been raised in a post-conviction proceeding rather than in a petition for writ of error coram nobis.  We agree.  The petitioner in Freshwater filed a petition for writ of error coram nobis in which she alleged, among other things, juror misconduct on the basis that the jury had watched television newscasts about her case during the trial.  Id. at 552.  Recognizing, however, that "[t]he writ of error coram nobis is an 'extraordinary procedural remedy,' filling only a 'slight gap into which few cases fall,'" id. at 553 (quoting Mixon, 983 S.W.2d at 672), this court concluded that the petitioner's appropriate avenue for raising the claim of juror misconduct was in a petition for post-conviction relief:

> The allegations of juror misconduct, on the other hand, could have been discovered by the petitioner and raised in a post-conviction petition.  Therefore, we determine that the allegations of juror misconduct do not amount to new evidence of innocence which would have resulted in a different judgment had it been presented at trial.  See Tenn. Code Ann. § 40-26-105; see also State v. Doyle Hart, No. 02C01-9612-CC-00451, 1997 WL 563613, at *6 (Tenn. Crim. App. at Jackson, Sept. 10, 1997); Kenneth C. Stomm v. State, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App. at Knoxville, May 12, 1992) (stating that "[t]he [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition."); State v. James D. "Sonny" Yarbrough, No. 01C01-9001-CC-00012, 1990 WL 109107, at *2 (Tenn. Crim. App. at Nashville, Aug. 3, 1990) (noting that the remedy of error coram nobis is also not available on matters that were or could have been litigated in a post-conviction proceeding).  Thus, regardless of our decision as to the remainder of the allegations, the petitioner's claim of juror misconduct is waived by failing to assert it in a timely petition for post-conviction relief.  See Tenn. Code Ann. § 40-35-102.

Id. at 556.

The record in this case reveals that the petitioner first learned of the alleged juror misconduct sometime in the year 2000, while his case was still pending in this court on direct appeal.  He could, therefore, have raised the claim of having been denied his constitutional right to a fair and impartial jury, as well as the claim that trial counsel was ineffective for failing to take any action in

-7-

pursuit of that claim, in a petition for post-conviction relief. Since he apparently failed to do so, he, like the petitioner in <u>Freshwater</u>, has waived that claim.

We also agree with the State that, even if not waived, the evidence presented at the evidentiary hearing did not support the petitioner's allegations of juror misconduct. Although the petitioner presented evidence that Ms. Jones may have later bragged to others that she had accessed and shared the petitioner's criminal record with her fellow jurors, none of the jurors who testified corroborated that claim. As the trial court observed, seven of the nine jurors who testified stated that they were not exposed to any information about the petitioner's criminal record or incarceration prior to rendering their verdicts. Mr. Gillespie, the only juror who testified he heard Ms. Jones make any extraneous comment about the petitioner, stated that she said only that she knew the petitioner was in prison, that the comment was made in passing at the end of the table after deliberations were completed, and that the jury did not resume deliberations or change its verdict in any fashion as a result of the information. Ms. Jones denied that she ever pulled the petitioner's criminal record and stated that she could not have done so because she had no access to the computer system where the records were stored. She further testified that she did not remember having said anything to her fellow jurors about her belief, based on her recognition of the transportation officers, that the petitioner was in jail and that she knew it would cause complications with the jury if she spoke of it. Thus, the key testimony of the jurors failed to show that the jurors were exposed to any extraneous information about the petitioner's prior record or current incarceration during their deliberations.

## CONCLUSION

Having reviewed the record and found no abuse of discretion on the part of the trial court, we affirm the order of the trial court denying the petition for writ of error coram nobis.

ALAN E. GLENN, JUDGE