IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 11, 2007

**TIMOTHY ROBERSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Gibson County**
**No. 14863     Allen W. Wallace, Senior Judge**

_____

**No. W2007-00230-CCA-R3-PC  - Filed November 7, 2007**

_____

The Petitioner, Timothy Roberson, appeals the denial of his motion to reopen his post-conviction petition that alleged ineffective assistance of counsel. This Court is without jurisdiction to entertain this issue because the Petitioner has failed to comply with the statutory requirements governing review of a denial of a motion to reopen. See Tenn. Code Ann. § 40-30-117. Also, in this appeal, the Petitioner, convicted of first degree murder and especially aggravated robbery in 1995, challenges the denial of his motion for a sample of his own blood. The Petitioner sought to determine his blood type in order to compare it with the blood type found on a towel in the victim's residence. The court determined that the motion for the Petitioner's blood sample should be denied as there was substantial evidence of the Petitioner's guilt presented at trial. Finally, the Petitioner appeals the dismissal of his petition for a writ of error coram nobis that alleged newly discovered evidence in the context of a Brady v. Maryland, 373 U.S. 83 (1963), violation. The coram nobis court[1] concluded that any relief was time-barred and that the Petitioner had failed to state a cognizable claim. We affirm the judgment of the Gibson County Circuit Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Richard Vaughn, Milan, Tennessee, for the appellant, Timothy Roberson

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; and Garry Brown, District Attorney General, for the appellee, State of Tennessee.

---

[1] The court below treated all of the Petitioner's motions and petitions, both post-conviction and coram nobis, as one case under one docket number. Presumably, this was done because the main focus of the underlying proceedings was on the serology report examining the blood type on the towel found in the victim's apartment. On appeal, the parties concentrate on the dismissal of the petition for a writ of error coram nobis and, therefore, we will refer to the court below as the coram nobis court for purposes of this opinion.

# OPINION

## Factual and Procedural Background

In 1995, a Gibson County jury convicted the Petitioner of first degree murder and especially aggravated robbery, and he was thereafter sentenced to consecutive terms of life imprisonment without parole and fifteen years. See State v. Timothy Roberson, No. 02C01-9508-CC-00245, 1997 WL 736513 (Tenn. Crim. App., Jackson, Dec. 1, 1997), perm. to appeal denied, (Tenn. June 29, 1998). On direct appeal, this Court set forth the facts underlying the Petitioner's convictions:

Clyde Smith, the father of the victim, Robert Smith, testified that he saw his son at approximately 9:30 p.m. on November 26, 1993. He said that on November 28, his mother called and told him that she had not seen the victim over the Thanksgiving weekend and that he always came by on Saturday. Mr. Smith stated that he and his other son, Charles Smith, went to the victim's apartment. He testified that he discovered the door to the apartment open and the lights out. According to Mr. Smith, Charles entered the apartment and called the victim's name, and when the victim did not respond, they left the apartment, believing that the victim had stepped outside. He said that they returned at about 6:30 p.m. and discovered the victim dead, lying on his back in a pool of blood in the kitchen. He testified that the apartment had been ransacked. Mr. Smith stated that he later found several items missing from the victim's apartment, including a VCR. He also said that he told Sergeant Morris that the victim generally carried a large sum of cash with him. According to Mr. Smith, the victim had some learning disabilities, although he was not classified as being mentally retarded and was able to function in society.

Dr. Jerry Francisco, a pathologist, testified that he along with Dr. Violet Hnilica conducted an autopsy of the victim. He stated that the examination of the victim showed that the cause of death was multiple injuries to the body. He said that the victim suffered blunt-force injuries to the head, cuts to the neck and a group of stab wounds to the chest. In Dr. Francisco's opinion, any of the types of injuries could have caused the victim's death. He testified that the injuries caused damage to the brain, the voice box, the lungs and the heart. He stated that there were thirteen stab wounds to the chest that were deep, penetrating the victim's heart, lungs and ribs. He said that two of the cuts to the victim's neck severed the jugular vein. Dr. Francisco described the victim's blunt-force injuries to the head as a broken skull extending to the base of the skull. On cross-examination, Dr. Francisco testified that it was possible that death or unconsciousness could have occurred after the first few injuries were inflicted. He also conceded that if the victim was unconscious after the first few injuries were inflicted, he would not have felt any pain. Dr. Francisco admitted that there was no way for him to determine how quickly the victim died, but he said that it would have taken at least minutes.

Sergeant Jerry Morris of the Milan Police Department testified that he responded to a call regarding the victim. He said that he discovered the victim lying on his back and partially on his right side in the kitchen surrounded by blood on the floor, wall and refrigerator. He stated that the victim was wearing a T-shirt and jeans and did not have shoes or socks on. Sergeant Morris testified that he found a towel with blood on it hanging on a towel rack in the bathroom. He also said that the bedroom had been ransacked in that clothes had been taken out of drawers and thrown at the foot of the bed. Sergeant Morris stated that the television in the living room was on but that the cable had been disconnected.

Sergeant Morris testified that the [Petitioner] was interviewed by the Milan Police Department on three occasions: (1) during the initial investigation, (2) on November 29, 1993, after Sergeant Morris talked to the [Petitioner's] girlfriend, Clara Langley, and an informant, and (3) on December 5, 1993. He said that he obtained a ring from Ms. Langley and that the informant told him about seeing the [Petitioner] with the VCR and the movies. Sergeant Morris said that during the second and third interviews of the [Petitioner], the [Petitioner] gave a statement. He testified that the [Petitioner] also gave a statement to the Tennessee Bureau of Investigation on November 30, 1993. Sergeant Morris stated that after the [Petitioner's] second interview, he recovered the victim's ring, approximately nine movies, VCR and a remote control, with the movies and the VCR being found at the [Petitioner's] home. He said that he verified that the VCR belonged to the victim. He testified that he also recovered the victim's wallet and diamond ring. Sergeant Morris stated that the [Petitioner] took him to where the [Petitioner] disposed of the wallet in a bush approximately fifty feet from Salinger Road. He testified that he recovered the victim's paycheck from a Texaco Station in Milan. He also identified the [Petitioner's] hiking boots and stated that the [Petitioner] told him that he was wearing the boots during the time of the victim's death.

The [Petitioner's] statement given to the Milan Police Department on November 29, 1993, reflects that the [Petitioner] claimed that he was at his brother's house and then went to the house of Nikki Wright between the hours of 9:00 p.m. and 2:00 a.m. on November 26, 1993. It also shows that the [Petitioner] told Sergeant Morris that he purchased a ring and VCR from a guy who was driving a 1991 or 1992 Grand Prix about 10:30 or 11:00 p.m. It states that the [Petitioner] told the officers that he paid fifty dollars for the ring and that he traded an air pump for the VCR, although he did not know who owned the items. The statement reflects that the [Petitioner] asserted that he got the air pump from the mother of his girlfriend and that the movies belonged to other people. It also states that the [Petitioner] denied harming the victim and that the [Petitioner] claimed that he had not seen the victim. In the interview, the [Petitioner] explained that his prints could be in the apartment because he visited the victim's home approximately three to four months earlier.

The [Petitioner's] written statement given to the TBI on November 30, 1993, reflects that the [Petitioner] admitted killing the victim. The [Petitioner] told the officers that he was addicted to crack cocaine and that he had borrowed money from the victim, with whom the [Petitioner] worked, on previous occasions to purchase drugs. He told them that he and the victim were paid on the Wednesday before Thanksgiving and that he spent two hundred dollars on crack cocaine which he smoked on Friday. The [Petitioner] said that he went to the victim's apartment between 11:30 p.m. and midnight because he was out of money and wanted to get some more crack cocaine. The [Petitioner] said that the victim was watching television when he arrived and that he was wearing a T-shirt and pants but no socks or shoes. He said that he asked the victim for twenty-five dollars, but the victim refused, saying that the [Petitioner] owed him twenty-five dollars from one week earlier. The [Petitioner] said that he became mad and that he and the victim argued, pushed and shoved each other near the dining table. He stated that the victim told him to leave and then slapped him on the right side of his face.

The statement also reflects that the [Petitioner] told the officers that he "lost it" when the victim slapped him and that he grabbed a brown kitchen knife and struck the victim in the middle of the chest. The [Petitioner] said that he could not stop and that after the knife broke, he began kicking the victim in the head, shoulders and side while the victim was lying in the kitchen floor. He said that he then picked up a silver knife and stabbed the victim again in the chest, although he could not recall how many times. The [Petitioner] told the officers that the victim was still alive and was trying to remove a box cutter from his left pocket to try to stop him when he took the box cutter from the victim and cut the victim's throat. The [Petitioner] stated that he was so mad that he could not stop and claimed that he did not mean to do it but that he lost his mind. According to the [Petitioner's] statement, the [Petitioner] went to the bathroom and wiped his hands on a towel at some point.

The [Petitioner's] statement to the TBI also shows that the [Petitioner] said that he looked throughout the apartment for money or anything to sell, including the [Petitioner's] bedroom dresser drawers. He also admitted taking the victim's wallet, keys, ring, VCR and movies from the victim's apartment. According to the [Petitioner], the victim's wallet contained one hundred and fifty dollars in cash and a paycheck in the amount of one hundred and fifty-nine dollars. The [Petitioner] told the officers that he went to his cocaine dealer's apartment in Milan immediately after leaving the victim's apartment and purchased crack cocaine. According to the [Petitioner], he took the VCR and movies to his apartment and threw the victim's wallet into a field. The statement reflects that the [Petitioner] conceded cashing the victim's paycheck at a Texaco the next morning and using the money to purchase more crack cocaine.

Sergeant Morris also testified that the [Petitioner] gave a statement on December 5, 1993. The statement reflects that the [Petitioner] denied killing the victim and that he claimed that he had blackout spells and when he awoke, he saw a "figure," although he saw no one. On cross-examination, Sergeant Morris testified that the [Petitioner] was crying and appeared to be remorseful during the statement given to the police department on November 30, 1993. He also stated that his investigation did not reveal anything that would conflict with what the [Petitioner] told him had occurred on the night of the murder.

Mike Cleary, an employee of Texaco, testified that the [Petitioner] came into the store at approximately 5:30 a.m. and asked him to cash the victim's payroll check. He said that he cashed the check, although the [Petitioner] told him that he did not have any identification with him.

Bobby Mosley, owner of the Jewel Box in Milan, identified a lady's diamond ring that he sized for the [Petitioner]. He testified that he had earlier sold the ring to the victim.

Clara Langley testified that she was living with the [Petitioner] at the time the offense occurred and that she worked with both the [Petitioner] and the victim. She identified the lady's diamond ring as the one the [Petitioner] gave to her at 4:00 a.m. on the Saturday morning after the victim's death when the [Petitioner] asked her to marry him. Ms. Langley said that she asked him where he got the ring and that the [Petitioner] told her that he got it at a jewelry store in Humboldt. She also identified the VCR, remote control and videotapes and stated that the [Petitioner] brought them into their house on either Saturday or Sunday. She said that when she asked the [Petitioner] where he got the VCR, the [Petitioner] told her that he had gotten the items from a man who had a flat tire and he claimed that he traded an air pump for the VCR. On cross-examination, Ms. Langley testified that she suspected that the [Petitioner] was spending a lot of money on drugs around the time of his arrest. She also stated that the [Petitioner] was real nervous on Saturday morning.

Dr. Lynn Zager, a clinical psychologist, testified that she examined the [Petitioner] on November 2, 9, and 16, 1994, to determine the [Petitioner's] competency to stand trial and his mental condition at the time of the offense. She said that her evaluation showed that the [Petitioner] was an alcoholic and was addicted to cocaine and marijuana. She stated that the [Petitioner] was intoxicated at the time of the offense. In Dr. Zager's opinion, the [Petitioner's] behavior was partly a result of his intoxication, and the [Petitioner's] intoxicated state compromised the [Petitioner's] ability to conform his behavior to the requirements of the law. Dr. Zager testified that the [Petitioner's] initial denial of guilt was consistent with his determination that the [Petitioner] suffered from substance abuse. She stated that she found the [Petitioner] to be remorseful about his conduct.

Dr. Zager's psychological evaluation report shows that the [Petitioner's] father was an alcoholic and that his brother and sister have serious substance abuse problems. It reflects that his parent's divorced at an early age and that the [Petitioner's] stepfather was verbally abusive to the [Petitioner]. The report states that the [Petitioner], a high school graduate, began drinking and smoking marijuana at age eighteen and began using cocaine in 1991. It shows that the [Petitioner's] substance abuse became critical in 1992 when he lost his car and his job. The report reflects that the [Petitioner] stopped using drugs and alcohol for a period of time but began abusing alcohol, marijuana and cocaine approximately three weeks before the offense occurred. The results of the report are that although the [Petitioner] has maintained a relatively stable work history, he engages in behaviors that would warrant a diagnosis of a conduct disorder or antisocial personality disorder. It states that the [Petitioner] functions in the low average range of intelligence. The report shows that Dr. Zager's findings were that the [Petitioner] was competent to stand trial and that although the [Petitioner's] ability to conform his behavior to the requirements of the law was compromised because of his substance abuse, the [Petitioner's] ability to appreciate the wrongfulness of his behavior was not significantly impaired. In Dr. Zager's opinion, the [Petitioner] was sane at the time of the offense.

Richard Clark, a friend of the [Petitioner], testified that the [Petitioner] came by his house at approximately 1:30 a.m. on November 27, 1993. He said that the [Petitioner] was "high" from smoking crack cocaine, "kind of nervous," and "jittery." Mr. Clark stated that the [Petitioner] had some crack cocaine with him and that the [Petitioner] smoked while he was with him.

Id. at *1-5. This Court affirmed the Petitioner's convictions and sentences on direct appeal. See id.

The Petitioner later sought post-conviction relief on the bases that his confession was involuntary and that trial counsel rendered ineffective assistance. See Timothy Roberson v. State, No. W2001-00549-CCA-R3-PC, 2002 WL 1592725 (Tenn. Crim. App., Jackson, July 12, 2002). The post-conviction court denied relief, and this Court affirmed. See id. The Petitioner's untimely application for permission to appeal was dismissed, and our Supreme Court denied the Petitioner's motion to rehear that dismissal.

The current action was initiated on November 4, 2002, when the Petitioner's pro se "Motion for Relief of Judgement [sic] from Order Denying Petition for Post[-]Conviction Relief" was filed. In the motion, the Petitioner argued: (1) that his "convictions and sentences were obtained in violation of his right against self-incrimination and [d]ue [p]rocess" because his confession was involuntarily given; (2) that his "convictions and sentences are void and violated the Sixth and Fourteenth Amendment to due process [sic] in that they were obtained through the State withholding exculpatory evidence"; (3) that his convictions and sentences were obtained in violation of his right to be free from unreasonable search and seizures because officers had no warrant or probable cause

to arrest the Petitioner; and (4) that "[t]he denial of counsel at the preliminary stages was prejudicial in that the [g]rand [j]ury was exposed to evidence that clearly was inadmissible." The Petitioner sought relief in the form of setting aside the verdicts of guilt or in the alternative for a new trial.

Thereafter, on May 22, 2003, the Petitioner moved to amend his "original motion" stating that he was petitioning to reopen his original post-conviction case. He alleged two grounds for relief. First, citing the perceived deficiencies of his various counsel, he alleged that his constitutional rights to due process and equal protection were violated "in that he [was] denied the guaranteed right to a full and fair hearing of his post-conviction petition." Second, noting post-conviction counsel's failure to timely file an application for permission to appeal from this Court's post-conviction opinion, he submitted that his constitutional rights to due process and equal protection were violated "in that he [was] denied the opportunity to appeal his post-conviction claims to the Tennessee Supreme Court because measures were frustrated because of malpractice of his attorney." Again, he sought to have the verdicts set aside and alternatively be granted a new trial. In August of 2004, counsel was appointed to represent the Petitioner.

This appeal also involves the denial of the Petitioner's motion for a blood sample and medical records. Following the appointment of counsel, the Petitioner filed a motion, on December 17, 2004, requesting the court to order that his blood be drawn for a determination of his blood type and for the Department of Correction to provide all of the Petitioner's medical records to him. The Petitioner relied on the following facts in support of this motion: that "samples of blood were taken at the scene of the crime for which [he] was convicted, [that] blood samples were taken from the victim, and that a towel containing blood samples was introduced at trial as evidence." According to the Petitioner, his blood type was "at issue" because this information "might eliminate [him] as the perpetrator of the crime."

The State responded to the Petitioner's motion for a blood sample, stating, "Although, it does not expressly request a DNA analysis, on its face, this [m]otion appears to be a petition for comparison analysis which would fall under Tennessee's Post-Conviction DNA Analysis Act of 2001 . . . . The State is not aware of any other basis in law for granting the relief sought." Citing to Tennessee Code Annotated sections 40-30-304 and -305, the State argued that the Petitioner had failed to meet the "reasonable probability" standards of those sections—"that he would not have been prosecuted or convicted if DNA analysis provided exculpatory results" or "that DNA results would have resulted in a more favorable verdict or sentence." In further support of this argument, the State quoted this Court's analysis in the Petitioner's post-conviction appeal: "[T]he proof against [the Petitioner] was substantial and damning." Roberson, 2002 WL 1592725, at *10. As to the second prong of DNA analysis under sections -304 and -305—that the evidence must still be in existence, the State contended that the petition also failed because no "items of physical evidence . . . with blood on them" were capable of being located, and the State attached affidavits of various state officials to that effect.

Also included in this appeal for our review is the Petitioner's request for coram nobis relief. Following the State's response to the Petitioner's motions, the Petitioner filed a pro se petition for

a writ of error coram nobis on June 8, 2005. The Petitioner alleged that newly discovered evidence existed that would prove his innocence and would have resulted in a different outcome at trial. He noted that the proof at trial was that he wiped his hands on a towel (introduced into evidence as an exhibit) after repeatedly stabbing the victim. The blood type on the towel was inconsistent with the blood type of the victim, and the jury was not informed of this fact. Moreover, no "serology" was performed on the knives removed from the victim's home. According to the Petitioner, he became aware of this information "after the denial of post[-]conviction relief in the trial and appellate court . . . ." The Petitioner argued that, in light of the serology report which he had recently discovered, he "could have shown unto the jury that he was innocent, because the [victim's] blood [was] not on the towel although Officer Jerry Morris testified that [the P]etitioner wiped the [victim's] blood on the towel after stabbing the [victim] a total of (25) times." Again, the Petitioner requested that the court set aside his convictions or in the alternative grant him a new trial.

A hearing on the Petitioner's motions was held on April 5, 2006. The Petitioner's counsel first acknowledged that the State had diligently attempted to find the towel introduced at trial but was unable to do so.[2] Counsel continued, arguing that typing of the Petitioner's blood was necessary so that he could determine if the blood on the towel belonged to him, as the serology report showed that the blood did not belong to the victim. If the blood did not belong to either the Petitioner or the victim, it would lead "to the argument . . . for trial purposes that there [might] have been another person there." Moreover, it would then have been "critical" for trial counsel to "keep the confession out" because trial counsel, under the proof as it existed at trial, chose not to suppress the confession as it was relevant to "maybe a lesser level of homicide." Counsel did not argue the motion to reopen the post-conviction petition, stating that he was focusing on the one "most relevant . . . ."

The State responded that the Petitioner was "trying to relitigate the amount of proof against him, which . . . [were] issues that have previously been determined or should have been as part of [the Petitioner's] direct appeal." The State noted that the Petitioner's "defense wasn't that he didn't do it, but what level of offense he would be convicted of" based upon his drug use at the time of the murder. Finally, the State submitted that the Petitioner did not meet the requirements of the Post-Conviction DNA Analysis Act and stated that the Petitioner was only "trying to take another bite of the apple ten years after the fact" by arguing a third party might have been present at the scene.

At the conclusion of the hearing, the coram nobis court denied the Petitioner's motion for a blood sample. The parties adjourned and agreed to continue the hearing on the petition for a writ of error coram nobis.

A hearing was held on the request for coram nobis relief on September 28, 2006. The Petitioner reviewed the various motions and petitions filed in this case and testified concerning the deficiencies of his various counsel. According to the Petitioner, his post-conviction counsel brought

---

[2] It is apparent from the record that, at some point prior to the April 5 hearing, the parties appeared in court and that the coram nobis court was "contemplating allowing, if possible, some DNA testing on the towel . . . ." There is no transcript of this proceeding in the record.

him "a stack of papers" during the processing of his original post-conviction petition, and he "went through part of it . . . ." It was then, for the first time, that he saw the forensic and serology reports on the knives and the towel removed from the victim's home. The Petitioner testified that he did not have any cuts or abrasions after murdering the victim. He further stated that the reports and the "arrest procedure" were "never litigated prior to trial."

Following further questioning on direct examination, the Petitioner, in direct opposition to his prior testimony, stated that he did not see the reports until after the conclusion of his post-conviction hearing. According to the Petitioner, the documents were important to his defense because the serology report showed that the blood on the towel was a different blood type than the victim's blood. He further noted that serology analysis was not performed on the knives even though "the knives had blood on the handles and the blade" and that his fingerprints were not found on the knives.

The Petitioner then provided extensive testimony on the several statements he gave to law enforcement officials and the circumstances surrounding those statements. The Petitioner said that the State had not provided one of his statements to him during the discovery process—a "one page oral statement that was taken from [him] at [his] job." The Petitioner did not dispute that in another statement he confessed to the murder, wherein he said he wiped his hands on a towel after stabbing the victim. Asked whether the issue of suppression of his statements was addressed in the Court of Criminal Appeals, the Petitioner answered, "Yes, but it wasn't fully explored."

After hearing testimony, the coram nobis court ruled that the petition for coram nobis relief was time-barred and that he had failed to state a cognizable claim for relief. By order dated December 4, 2006, the coram nobis court denied all of the Petitioner's motions pertaining to post-conviction relief and dismissed his petition for coram nobis relief. The Petitioner now appeals from this order.

## I. Motion to Reopen Post-Conviction Petition[3]

In its single order denying relief, the coram nobis court denied the Petitioner's motions. The Petitioner filed a notice of appeal to challenge this ruling, along with the dismissal of his motion for a blood sample and his petition for a writ of error coram nobis, sixteen days after the order was entered. We make clear that the Petitioner's motion "for relief of judgement [sic]" and his motion to amend this "original motion" will be treated together as a motion to reopen his original post-conviction petition.

In seeking review of the denial of a motion to reopen, a petitioner shall file, within ten days of the lower court's ruling, an application *in the Court of Criminal Appeals* seeking permission to

---

[3] The argument portion of the Petitioner's brief focuses on the dismissal of his petition for a writ of error coram nobis. The State only argues the merits of the petition for coram nobis relief on appeal and does not argue that any appeal regarding the other pleadings is waived. The Petitioner's brief does present as issues the denial of all "pending motions and petition" and the denial of his motion for a blood sample. We will address each pleading in turn.

appeal.  See Tenn. Code Ann. § 40-30-117(c) (emphasis added); Tenn. Sup. Ct. R. 28 § 10(b). *The application shall be accompanied by copies of all the documents filed by both parties in the trial court and the order denying the motion.*  Tenn. Code Ann. § 40-30-117(c) (emphasis added); see also Tenn. Sup. Ct. R. 28 § 10(b).  In the present case, the Petitioner has failed to comply with the statutory requirements for seeking appellate review.  Specifically, the notice of appeal document was filed more than ten days after the order was entered, and the Petitioner failed to file his application in the proper court and attach the proper documentation.

An appeal as of right is not available for review of a lower court's denial of a motion to reopen a petition for post-conviction relief.  See Tenn. R. App. P. 3(b); see also John Harold Williams, Jr. v. State, No. W1999-01731-CCA-R3-PC, 2000 WL 303432, at *1 (Tenn. Crim. App., Jackson, Mar. 23, 2000).  A petitioner must comply with the statutory requirements contained in section 40-30-117(c).  See Williams, 2000 WL 303432, at *1; William Lee Drumbarger v. State, No. M1999-01444-CCA-R3-PC, 1991 WL 242933, at *1 (Tenn. Crim. App., Nashville, Dec. 7, 1999); Lucy Killebrew v. State, No. 03C01-9809-CR-00320, 1999 WL 813471, at *2 (Tenn. Crim. App., Knoxville, Oct. 5, 1999).  The failure of a petitioner to comply with statutory requirements governing review of a denial of a motion to reopen deprives this Court of jurisdiction to entertain such matter. Williams, 2000 WL 303432, at *1.  Finally, neither the Post-Conviction Procedure Act nor the Rules of the Supreme Court permit this Court to suspend the statutory requirements.  Id.  This Court is without jurisdiction to entertain this matter.

Notwithstanding, even had the application vested this Court with jurisdiction, the motion fails to assert a claim upon which a motion to reopen a petition for post-conviction relief may be granted.   Section 40-30-117, Tennessee Code Annotated, governs motions to reopen a post-conviction petition.  See also Tenn. Sup. Ct. R. 28 § 2(c).  A motion to reopen a prior post-conviction petition may only be filed if a petitioner alleges one of the following:

> (1) a final ruling of an appellate court establishes a constitutional right that was not recognized as existing at the time of trial and retrospective application of the right is required;

> (2) new scientific evidence exists establishing that the petitioner is actually innocent of the convicted offense(s); or

> (3) the petitioner's sentence was enhanced based upon a prior conviction which has subsequently been found invalid.

Tenn. Code Ann. § 40-30-117(a).

The Petitioner does not allege grounds that would allow him to reopen his previous petition for post-conviction relief.  While the Petitioner argues various reasons in his motions that his constitutional rights have been violated, he has not alleged a constitutional right that was not recognized as existing at the time of trial and requiring retrospective application.  Moreover, as

discussed in more detail below, the serology report relied on by the Petitioner is not new scientific evidence establishing that the Petitioner is innocent of the convicted offenses. The Petitioner's motion to reopen fails.

## II. Motion for a Blood Sample

The Petitioner also moved "to obtain blood sample and medical records" requesting permission to take a sample of his own blood to determine his blood type and asking for all of his medical records in possession of the Department of Correction. The State responded to the Petitioner's motion as a request for DNA analysis under the Post-Conviction DNA Analysis Act of 2001. See Tenn. Code Ann. §§ 40-30-301 to -313.

The Post-Conviction DNA Analysis Act of 2001 allows a petitioner convicted of certain crimes, including first degree murder, to petition the court at any time for DNA analysis of evidence in the possession or control of the State. See id. § -303. Pursuant to this Act, a person convicted of first degree murder

> may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Id.

The coram nobis court did not specifically reference how it was treating the Petitioner's motion for a blood sample despite much discussion at the April 5 hearing regarding the form of the motion. At the conclusion of the hearing, the court denied the motion:

> I'm going to deny his motion to have a blood test and I don't see where it can be of probative value. It makes no difference what it shows because of the evidence in this case.
>
> . . . .
>
> Now, it's obvious that after a diligent search the towel can't be found, but I'm not convinced that with the weight of the evidence already that it was even mandatory.

Treated as a petition for post-conviction DNA testing, the Petitioner failed to satisfy the qualifying criteria under the Post-Conviction DNA Analysis Act. Courts will order DNA testing when:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. Additionally, Tennessee Code Annotated section 40-30-305 provides as follows:

After notice to the prosecution and an opportunity to respond, the court may order DNA analysis if it finds that:

(1) A reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Id. § -305.

As the State noted in its response to the Petitioner's motion for a blood sample, the Petitioner has failed to meet the "reasonable probability" standards of sections -304 and -305, i.e., that the Petitioner would not have been prosecuted or convicted if DNA analysis provided exculpatory results or that DNA results would have resulted in a more favorable verdict or sentence. Any typing of the

-12-

Petitioner's blood would not have produced exculpatory results or proved his innocence, and "the proof against [the Petitioner] was substantial and damning." Roberson, 2002 WL 1592725, at *10.

We also agree that the petition fails under the second prong of DNA analysis because no "items of physical evidence . . . with blood on them" were capable of being located. The State provided numerous affidavits to this effect. As a petition for DNA testing, the coram nobis court correctly denied the Petitioner's request.

When viewed simply as motion for the Petitioner's blood sample, no appeal lies as of right under Tennessee Rule of Appellate Procedure 3(b). Notwithstanding, his request for typing of his blood is simply an effort to relitigate issues of guilt or innocence and trial strategy. Contrary to the assertions of the Petitioner, the determination of his blood type will not eliminate him as the perpetrator of these crimes.

We also note that the Petitioner has not made allegations that would allow us to treat the appeal as a writ of certiorari. The Petitioner has not alleged that the coram nobis court has exceeded its jurisdiction or acted illegally or arbitrarily. See Tenn.Code Ann. § 27-8-101. "Generally, the writ of certiorari is limited in application and may not ordinarily be used 'to inquire into the correctness of a judgment issued by a court with jurisdiction.'" Moody v. State, 160 S.W.3d 512, 515 (Tenn. Crim. App. 2005) (quoting State v. Adler, 92 S.W.3d 397, 401 (Tenn. 2002)). The motion was properly denied.

### III. Writ of Error Coram Nobis

On appeal, the Petitioner argues that he is entitled to coram nobis relief because he was not aware of the information in the serology report until after his post-conviction hearing and that this information would have been helpful in suppressing his confessions at trial.[4] Specifically, he submits that "[h]ad [he] had this information it could have been used at trial to create reasonable doubt as to" his guilt.

A writ of error coram nobis is available to a petitioner in a criminal prosecution. Tennessee Code Annotated section 40-26-105 provides, in pertinent part:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence

---

[4] While the Petitioner provided testimony at the hearing that he did not receive one of his statements given to police until after the post-conviction hearing, the Petitioner does not specifically challenge this issue on appeal. Nonetheless, we note that all of the Petitioner's statements were thoroughly discussed at trial. Moreover, this Court discussed the suppression of these statements and any ineffectiveness related thereto in the Petitioner's post-conviction appeal. See Roberson, 2002 WL 1592725.

relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 375.

To establish that he is entitled to a new trial, the Petitioner must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. Freshwater, 160 S.W.3d at 553; Hart, 911 S.W.2d at 374-75.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003).

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. Tenn. Code Ann. §§ 27-7-103, 40-26-105; Mixon, 983 S.W.2d at 671 (Tenn. 1999). The one-year statute of limitations may be tolled only when necessary so as not to offend due process requirements. See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. See Harris, 102 S.W.3d at 593.

Based on the record, it is clear that the petition was filed several years after the statute of limitations had expired. However, the court in this case did not summarily dismiss the coram nobis petition but held an evidentiary hearing at which the Petitioner was present and gave testimony. At the inception of the hearing on September 28, the assistant district attorney general noted that "the writ was filed outside the statute of limitations." The Petitioner then gave testimony in support of

his petition for coram nobis relief. At the conclusion of the hearing, the State again objected to the petition as untimely: "[Tennessee Code Annotated section] 27-7-103 gives us the one[-]year statute of limitations for Writ of Error Coram Nobis and that statute says the writ must be filed within one year after the judgment in the case becomes final."

The Petitioner was given fair notice of the statute of limitations defense and had an opportunity to rebut it. See Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995). The coram nobis court ruled that "[t]he statute of limitations has long since run in these cases." Dismissal of the petition would have been warranted on this basis alone.

The Petitioner, citing Freshwater, 160 S.W.3d 548, and Workman, 41 S.W.3d 100, alleges that due process requires tolling of the one-year statute of limitations because he did not become "aware" of the serology report until "exhausting . . . his post-conviction procedure." Said another way, the Petitioner is alleging newly discovered evidence in the context of a Brady v. Maryland, 373 U.S. 83 (1963), violation, i.e., that the State withheld the report and that therefore due process requires tolling of statute of limitations.[5]

The Petitioner's own testimony at the September 28 hearing, while contradictory at times, indicates that his attorneys were in possession of the forensic and serology reports at the time of trial and that the Petitioner himself was in possession of them at his post-conviction hearing. Regardless of whether the Petitioner had seen the actual reports, the Petitioner's trial counsel were aware of the information contained in the forensic and serology reports. The Petitioner has failed to allege any ground for which the statute of limitations should be tolled. See Mixon, 983 S.W.2d at 668.

Moreover, the Petitioner has not stated a cognizable claim for coram nobis relief because the Petitioner was previously aware of the information in the serology report. The evidence is not newly discovered evidence. "The [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition." Bruce Alan Littleton v. State, No. M2006-01675-CCA-R3-CO, 2007 WL 845900, at *3 (Tenn. Crim. App., Nashville, Mar. 14, 2007), perm. to appeal denied, (Tenn. Aug. 13, 2007); Kenneth C. Stomm v. State, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App., Knoxville, May 12, 1992); see also Tenn. Code Ann. § 40-26-105. The Petitioner has failed to raise a cognizable claim for coram nobis relief because the issue could have been litigated previously and because he was not without fault in failing to raise the blood type discrepancy at the appropriate time. Additionally, the evidence sought by the Petitioner would not establish his innocence.

---

[5] The Petitioner's motion to amend his "original motion" raises issues regarding post-conviction counsel's failure to file an application for permission to appeal to the Tennessee Supreme Court. Our supreme court concluded in Stokes v. State, 146 S.W.3d 56, 60-61 (Tenn. 2004), that the due process contemplated in Williams v. State, 44 S.W.3d 464 (Tenn. 2001), does not apply to post-conviction proceedings. The Petitioner had failed to demonstrate that due process required tolling of the statute of limitations.

**CONCLUSION**

For the reasons stated herein, the Petitioner's failure to properly perfect an application for permission to appeal his motion to reopen his prior post-conviction petition divested this Court of jurisdiction to consider the appeal of that issue. We further conclude that the habeas corpus court did not err in denying the Petitioner's request to type a sample of his blood or in determining that the petition for coram nobis relief was time-barred. The judgment is affirmed.

_____
DAVID H. WELLES, JUDGE