IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2013 Session

## WILLIAM PAUL EBLEN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 97158      Steve W. Sword, Judge**

**No. E2012-01117-CCA-R3-CO - Filed August 28, 2013**

The Petitioner, William Paul Eblen, appeals from the Knox County Criminal Court's denial of his petition for writ of error coram nobis. The Petitioner contends that the coram nobis court erred in concluding that testimony from two witnesses alleging that the victim later recanted her allegations against the Petitioner was not credible. Following our review, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, William Paul Eblen.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

In 2001, the Petitioner was convicted of two counts of aggravated rape and one count of aggravated kidnapping, and he received an effective sentence of twenty-four years. State v. William Paul Eblen, No. E2002-01221-CCA-R3-CD, 2003 WL 22225636 (Tenn. Crim. App. Sept. 26, 2003), perm. app. denied, (Tenn. Mar. 8, 2004). At trial, the victim testified that on the evening of August 31, 1998, the Petitioner entered her car, pulled out a gun, and had her drive to a secluded area. The Petitioner then forced the victim out of her car, sliced

the front of her dress open with a knife, and raped her vaginally. During the rape, the victim tried to push away from the Petitioner, and he hit her in the face three times. Id. at *1.

After the Petitioner ejaculated, he forced the victim back into the car and had her drive him to an alley. The victim testified that the Petitioner had her get out of the car and bend over the hood. The Petitioner then raped the victim anally. The victim testified that she could "feel it ripping" as the Petitioner raped her. When he was finished, the Petitioner shoved a ten-dollar bill in the victim's mouth, told her, "Thanks for a good time," and left. The victim testified that she drove home and told one of her friends about what happened. Eblen, 2003 WL 22225636, at *1-2.

The friend testified at trial that she heard the victim's "laying on" her car horn and eventually went outside to check on the victim. When she got outside, she found the victim in her car, crying and upset with a "black eye" and a torn dress. According to the friend, the victim then told her that she had just been raped. The friend flagged down a police officer, and the victim was taken to the hospital. Two police officers testified that they observed injuries to the victim's face and upper lip and that these injuries appeared to be "consistent with injuries that occurred immediately after an assault." Another officer testified that the victim's dress appeared to have been cut with a knife and torn. Eblen, 2003 WL 22225636, at *2-3.

The examining doctor testified that the victim had bruising and swelling on her right check, that the injury appeared to have occurred in the previous two hours, and that the injury was consistent with having been inflicted by a fist. There was also a cut on the victim's upper lip. The examining doctor testified that he observed irritation on the victim's labia and that the victim's rectal area "appeared to be traumatized." The doctor observed that the area was "diffusely swollen . . . and there was a small tear" most likely caused by some type of penetrating trauma. A rape kit was performed and subsequent testing revealed the presence of sperm in samples taken from the victim's vagina and rectum. DNA testing of the samples determined that it was the Petitioner's sperm. Eblen, 2003 WL 22225636, at *2.

At trial, the Petitioner testified that he had consensual sex with the victim and that the victim was lying, but that he did not "have a clue" why she was lying. However, the Petitioner claimed that he only had vaginal sex with the victim and that he did not know how the victim injured her rectal area. The Petitioner's counsel theorized at trial that the injuries to the victim's face had been caused the previous night by the victim's boyfriend. The Petitioner presented testimony at trial from the police officer who responded to "a domestic call" the night before the alleged rape. The officer testified that the victim told him that her boyfriend had hit her with his fist and that he observed the victim to have a split lower lip. However, the Petitioner claimed that he did not notice any injuries to the victim's face, that

-2-

she did not complain about a hurt lip, and that her dress was not torn when he left her. Eblen, 2003 WL 22225636, at *3-4.

Prior to his direct appeal of his convictions, the Petitioner filed a writ of error coram nobis claiming that the victim had told three people that the Petitioner had not raped her. The trial court held a hearing on the petition during which the Petitioner presented testimony from two of the victim's ex-boyfriends. Both men claimed that the victim told them that she lied about the Petitioner's raping her because she was afraid that her boyfriend would beat her if he learned that she had consensual sex with the Petitioner. Both men admitted that they did not tell anyone about the victim's alleged statements until after the Petitioner's trial and after they had been incarcerated with the Petitioner. The Petitioner also presented the testimony of the mother of one of the men who claimed that the victim had made similar statements to her. The victim testified at the hearing that the witnesses were lying and reiterated that the Petitioner had raped her. Eblen, 2003 WL 22225636, at *9-10.

The trial court denied the petition for writ of error coram nobis, concluding that the witnesses were not credible. The trial court noted that both of the men were former boyfriends of the victim and did not come forward until after they had been incarcerated with the Petitioner. The trial court found that the testimony of the trial witnesses, along with the medical and physical evidence, corroborated the victim's claims and that it was not convinced that the victim had testified falsely at trial. On direct appeal, this court affirmed the Petitioner's convictions and concluded that the proof of the Petitioner's guilt was "overwhelming." This court also affirmed the trial court's denial of the Petitioner's petition for writ of error coram nobis, concluding that the trial court did not abuse its discretion in finding that the three witnesses were not credible. Our supreme court declined to review this court's opinions. Eblen, 2003 WL 22225636, at *4-10.

On May 5, 2011, the Petitioner filed a second petition for writ of error coram nobis, asserting that the victim's ex-boyfriend, Terry Norris, and her brother, B.P.,[1] had recently come forward to claim that the victim had told them that she had falsely accused the Petitioner of rape. The Petitioner also submitted affidavits from Mr. Norris and B.P.[2] The coram nobis court determined that the petition was not barred by the statute of limitations and held a hearing, at which both Mr. Norris and B.P. testified. The victim did not testify at this

---

[1]It is the policy of this court to identify victims of rape by their initials. In order to protect the privacy of the victim we will refer to her brother by his initials as well.

[2]These affidavits were not included in the appellate record. However, the State on cross-examination of both witnesses read extensive portions of the affidavits into the record.

hearing, and B.P. claimed that the victim was "on the run from parole." Mr. Norris testified that he had not seen the victim in years and did not know where she was.

At the hearing, B.P. claimed that sometime in the winter of 2001, he was at a party with the victim, and she was upset and intoxicated. B.P. testified that he asked the victim why she was upset, and she told him that the Petitioner "did not rape her." B.P. claimed that the victim said that "she went along with the rape thing" because she was afraid of Mr. Norris. According to B.P., the victim told him that she and the Petitioner had gone out "riding around, smoking, drinking, and they had sex." B.P. claimed that the victim told him that Mr. Norris discovered that she had sex with the Petitioner, and when she got home, Mr. Norris pulled her out of the car and "beat the s--t out of [her]." B.P. testified that the victim told him that she said she was raped in order to get Mr. Norris to stop beating her. B.P. also testified that the victim did not tell him how Mr. Norris found out that she and the Petitioner had sex.

B.P. admitted that he told no one about what the victim said to him until after he was incarcerated with the Petitioner. B.P. testified that he spoke with the Petitioner in the prison yard and that Mr. Norris was present during their conversation. B.P. claimed that he only talked to the Petitioner once[3] about what he knew and that the Petitioner asked him to have the prison's "legal clerk" type an affidavit for him to sign. B.P. testified that he wrote his statement himself and gave it to the clerk to type. However, B.P. later admitted that he only wrote out a brief outline of the facts, that the clerk "prettied [sic] them up," and that the affidavit actually contained the clerk's words and not his. B.P. also admitted that the affidavit stated that his alleged conversation with the victim occurred in 2009, that it stated that Mr. Norris only hit the victim in her face when he recalled the victim's saying that Mr. Norris beat her "all over," and that it stated that the victim told him the Petitioner did not have a weapon when he actually did not recall the victim's making such a statement.

B.P. testified that he had prior convictions for possession of cocaine with intent to sell, "weapons charges," criminal impersonation, and violation of the terms of his probation. B.P. also testified that he was close to the victim and that she had always "confided" in him. However, B.P. later admitted that he had not spoken to the victim in years. B.P. further admitted that he knew very little about the details of the alleged rape because he did not live with the victim when it occurred, that he rarely spoke to her at that time, and that he did not attend the Petitioner's trial. B.P. also admitted that outside of two brief periods of time when he lived with his sister, he hardly ever spoke to her.

---

[3]B.P. admitted that he had separate conversations with Mr. Norris about the alleged conversation he had with the victim.

Mr. Norris testified that he did not hit the victim on the night she alleged the Petitioner had raped her and that he did not see any blood on her face. Mr. Norris instead claimed that the night before the victim had "fell in the floor" and had "busted her lips and bruised her face." Mr. Norris claimed that when the victim returned home, he "[ran] up on" her and pulled her out of the car by her dress. Mr. Norris testified that he did not know if he tore the victim's dress when he grabbed her but that it was possible. Mr. Norris claimed that the victim did not act like someone who had just been raped and that she did not start crying until after she told him the Petitioner had raped her. Mr. Norris also claimed that the victim did not want to call the police, but that "the neighbors" had crowded around while they were talking and one of them was "already on the phone" with the police.

According to Mr. Norris, in 2009, he was at a party with the victim, and he described their relationship at the time as being "just friends." Mr. Norris claimed that the victim started crying and told him that she "had someone put in prison for something they didn't do." Mr. Norris testified that the victim told him that she "had always had [an] interest in" the Petitioner and that she had consensual sex with the Petitioner. Mr. Norris claimed that the victim told him that claiming the Petitioner raped her was "the first thing that [came] to her mind to say" when Mr. Norris "grabbed her and started wigging out on her." Mr. Norris also claimed that despite his relationship with the victim, that was the first time she had ever talked to him about the rape.

Mr. Norris testified that he told no one about the victim's alleged statements to him until after he had been incarcerated with the Petitioner. Mr. Norris admitted that the Petitioner's counsel had previously represented him in criminal court but that he did not say anything to counsel about the victim's alleged statements. Mr. Norris testified that he spoke to the Petitioner only once about the victim's alleged statements in the prison gym. Mr. Norris admitted that his affidavit contained factual inconsistencies with his testimony, such as incorrectly stating that he met with the Petitioner on the prison "ball field." Mr. Norris testified that he had no "ax to grind" with the victim. However, he admitted that in 2001, he was arrested and convicted of assault and aggravated burglary against the victim.

The coram nobis court, after reviewing the transcript of the Petitioner's trial, denied the petition. The coram nobis court concluded that the witnesses were not credible, noting that both men were convicted felons who did not come forward with this information until after they had been incarcerated with the Petitioner. The coram nobis court found the testimony of both witnesses to be inconsistent with the evidence at trial. The coram nobis court noted that the testimony at trial established that the victim told her friend about the alleged rape before she told Mr. Norris and that there was no evidence that Mr. Norris was present when she came home. The coram nobis court also noted the testimony at trial that

the victim's injuries appeared to be very recent and that she had trauma to her anal region. The Petitioner now appeals the decision of the coram nobis court.

## ANALYSIS

The Petitioner contends that the coram nobis court erred by denying his petition. The Petitioner argues that "the new evidence is trustworthy" given that several witnesses have alleged that the victim recanted her allegations against the Petitioner and that "had the jury heard [this new evidence], it might well have reached a different decision." The State responds that the Petitioner's claim should have been barred by the statute of limitations. The State further responds that the coram nobis court did not abuse its discretion in determining that the witnesses were not credible.

A writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105 (2006); see State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The purpose of a writ of error coram nobis "is to bring to the court's attention a previously unknown fact that, had it been known, would have resulted in a different judgment." Wilson v. State, 367 S.W.3d 229, 234-35 (Tenn. 2012). The decision to grant or deny the writ rests within the discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson, 367 S.W.3d at 235.

A petition for writ of error coram nobis must be filed within one year of the date the judgment of the trial court becomes final. See Tenn. Code Ann. §§ 27-7-103, 40-26-105; Mixon, 983 S.W.2d at 671. The one-year limitations period may be tolled only when required by due process concerns. See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). Courts must "balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless" in determining whether due process tolls the statute of limitations. Wilson, 367 S.W.3d at 234. To do so, courts perform the following steps:

(1) determine when the limitations period would normally have begun to run;
(2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-

arising," determine if, under the facts of the case a strict applications of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)).

Here, the limitations period would have begun upon the entry of the trial court's order denying the Petitioner's motion for new trial in 2002. B.P. and Mr. Norris both testified that they did not tell anyone about the victim's alleged statements until they spoke with the Petitioner in 2010. A strict application of the limitations period would "effectively deny [the] Petitioner a reasonable opportunity to present his claim." Wilson, 367 S.W.3d at 234. The State argues that the Petitioner's claim should be barred because he did not file his petition until a little over thirteen months after Mr. Norris spoke with him. However, our supreme court has previously held in a capital case that a petition filed thirteen months after the petitioner became aware of new evidence did not exceed the reasonable opportunity afforded by due process. Workman, 41 S.W.3d at 103; see also Sample v. State, 82 S.W.3d 267, 276 (Tenn. 2002) (concluding that a petition filed sixteen months after the new evidence was discovered was not per se unreasonable). Accordingly, we conclude that the coram nobis court did not err by determining that due process principles tolled the statute of limitations in this case.

Recanted testimony may qualify as newly discovered evidence and justify the granting of a writ of error coram nobis. Mixon, 983 S.W.2d at 672. However, newly discovered recanted testimony will only justify the granting of a writ of error coram nobis and a new trial if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17. This court has previously held that this test applies when the newly discovered evidence is a material witness' statements that are inconsistent with her trial testimony. Eblen, 2003 WL 22225636, at *10 n.3.

There is no evidence in the record that the trial court abused its discretion in determining that it was not reasonably well satisfied that the testimony given by the victim at trial was false and that the testimony of the witnesses was true. As both the trial and

coram nobis courts found, the testimony of the other witnesses at trial, along with the medical and physical evidence, corroborated the victim's claims. The victim had injuries to her anal region consistent with a rape, the injuries to her face appeared to be recent and inconsistent with the description of the injuries she had sustained the night before, and the victim's dress appeared to have been cut with a knife. The testimony of B.P. and Mr. Norris was inconsistent with the testimony at trial regarding what occurred when the victim returned home. There was no evidence that Mr. Norris was present, and it was established at trial that the victim's friend flagged down a police officer, not that the police were called as Mr. Norris claimed. The testimony of both B.P. and Mr. Norris was inconsistent with statements made in their affidavits and with the other's testimony. Both men were inconsistent in their descriptions of where, when, and how they informed the Petitioner about the alleged newly discovered evidence. Furthermore, both men are convicted felons who told no one about the victim's alleged statements until after they had been incarcerated with the Petitioner. Accordingly, we conclude that the coram nobis court did not abuse its discretion in denying error coram nobis relief on the basis that the witnesses were not credible.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE